OPINION
{¶ 1} Plaintiff-appellant, Robbie A. Boggs, appeals from a judgment of the Franklin County Court of Common Pleas that granted summary judgment in favor of defendants-appellees, The Scotts Company and related parties ("Scotts"), in this employment action alleging age discrimination, retaliation, promissory estoppel, and spoliation of evidence.
 {¶ 2} Appellant was a 28-year employee of Scotts in July 2001 when Scotts terminated her position. Scotts maintains that appellant's termination was part of a company-wide workforce reduction plan designed to cut costs during a period of financial difficulty. Appellant asserts that Scotts orchestrated a sequence of events, leading up to and including her termination, that were designed to humiliate and harass her, and that Scotts did so because she was 46 years old.
 {¶ 3} Headquartered in Marysville, Ohio, Scotts is a multi-national corporation specializing in lawn care and other horticultural products. The company has two divisions, its Consumer Business Group ("CBG"), and its Professional Business Group ("PBG"). Throughout most of appellant's tenure with Scotts, each of these groups included a subgroup servicing domestic accounts and a subgroup servicing international accounts. During the year prior to appellant's termination, Scotts reorganized the company so that appellant, who had been a customer service manager of the North American segment of the international subgroup of PBG, was reporting to Shirley Wulff, a customer service manager of PBG's domestic subgroup. Thus, appellant, who had worked independently of Wulff, and was at the same pay-grade and performed many of the same job duties as Wulff, became subject to Wulff's supervision.
 {¶ 4} This arrangement did not sit well with either Wulff, a 61-year-old, long-time Scotts employee, or with appellant, and friction developed. Prior to the restructuring, appellant, who had been highly regarded by the company, apparently had performed her job largely without supervision. After restructuring, appellant told Human Resources Representative Rosemary Smith that, among other things, Wulff was following her as she went about her daily duties, complaining without justification about appellant's performance and use of time, and canceling appellant's business trips at the last minute. Wulff complained to her supervisor, Vice President of North American PBG Raju Boligala, and to Human Resources Manager Kristen Black, that appellant was unwilling to accept the changes in management structure, uncooperative in implementing Wulff's directives, and uncommunicative regarding her daily work duties.
 {¶ 5} Smith's response to appellant's complaints was to urge appellant to communicate more directly with Wulff, and to attempt to be more cooperative. Appellant remained dissatisfied and became convinced that Wulff's actions, and those of others in the company, were part of a scheme intended to harass her and coerce her departure. In May 2001, appellant's attorney sent a letter to Scotts, stating in part:
It appears that during the past six months, despite her exceeding expectations during her last performance review and performing satisfactorily for more than 28 years, Robbie Boggs has been exposed to a systematic course of harassment, through a concerted effort of applying unreasonable work expectations, unrelenting intense supervision, and constant review. She has been periodically removed at the last minute from attendance at trade shows, followed from place to place at work, and treated in a manner inconsistent with that of other similarly situated employees. We assume that this systematic harassment and pressure is being orchestrated by Rosemary Smith, who was also involved in a similar program against another Scotts employee, Hap Baer, which eventually led to his resignation.[1] We believe that this treatment constitutes age and sex discrimination, in violation of Ohio Revised Code [Section] 4112.02. Unless this treatment ceases, we intend to proceed with an appropriate action to halt this activity, which is inconsistent with a [sic] treatment accorded to all other nontargeted Scotts employees.
 {¶ 6} In July 2001, Scotts terminated appellant's employment. In September 2001, appellant instituted this action in the trial court, alleging age discrimination in violation of R.C. 4112.02(A),[2] and retaliation in violation of R.C. 4112.02(I).[3] The court later granted appellant leave to amend the complaint to include counts alleging promissory estoppel and spoliation. In all counts, appellant sought compensatory and punitive damages, as well as attorney fees, for a total of $7,850,000 in damages.
 {¶ 7} Scotts moved for summary judgment, claiming that appellant's evidence failed to raise a genuine issue of material fact supporting her claims. In a comprehensive, 49-page decision, the trial court granted Scotts' motion, specifically finding:
1. [Appellant] failed to present a prima facie case of age discrimination because she submitted no evidence that Scotts replaced her with a younger worker.
2. [Appellant's] statistical evidence, by which she attempted to demonstrate that Scotts had repeatedly discriminated on the basis of age, showed only age and management level and did not account for other factors, such as individual performance, experience, education, or seniority level.
3. Scotts presented a legitimate, nondiscriminatory reason for [appellant's] termination, which was the elimination of redundancy as a cost-saving measure.
4. [Appellant] did not present evidence to counter this legitimate, nondiscriminatory reason, nor did she present evidence she was treated differently from similarly-situated persons outside her age group.
5. [Appellant] did not support her retaliation claim with evidence of a causal connection between her counsel's letter to Scotts and her termination.
6. [Appellant] failed to present evidence she was anything other than an at-will employee, and therefore could not support her claim for promissory estoppel.
7. [Appellant] failed to present evidence that Scotts employees willfully destroyed evidence pertinent to her lawsuit.
 {¶ 8} Appellant now assigns the following as error:
I. The trial court erred in granting defendant's motion for summary judgment on plaintiff's claim of age discrimination.
II. The trial court erred in granting defendants' motion for summary judgment on plaintiff's claim of retaliation.
III. The trial court erred in granting defendants' motion for summary judgment on plaintiff's claim of promissory estoppel.
IV. The trial court erred in granting defendants' motion for summary judgment on plaintiff's claim of spoliation of evidence.
V. The trial court erred in excluding testimony contained in plaintiff's affidavit.
VI. The trial court erred in failing to compel the production of discovery.
 {¶ 9} Assignments one through four raise issue with the trial court's decision to grant summary judgment. Appellate review of summary judgment motions is de novo. Helton v. Scioto Cty. Bd. of Commrs. (1997),123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." Mergenthal v.Star Banc Corp. (1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel. Grady v. State Emp. Relations Bd. (1997),78 Ohio St.3d 181, 183.
 {¶ 10} When proper evidence supports a motion for summary judgment, a non-moving party may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing a genuine triable issue. Civ.R. 56(E); Jackson v. Alert Fire Safety Equip., Inc. (1991),58 Ohio St.3d 48, 52. To establish the existence of a genuine issue of material fact, the non-moving party must do more than simply resist the allegations in the motion. Rather, that party must affirmatively set forth facts entitling him to relief. Wing v. Anchor Media, Ltd. of Texas
(1991), 59 Ohio St.3d 108, 111. If the non-moving party "does not so respond, summary judgment, if appropriate, shall be entered against the party." Civ.R. 56(E).
 {¶ 11} Appellant's first assignment of error charges that the trial court erred in granting summary judgment with regard to her age discrimination claim. Absent direct evidence, a plaintiff seeking to establish a prima facie case of age discrimination in an employment discharge action must show that he or she "(1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age." Coryell v. Bank OneTrust Co., N.A., 101 Ohio St.3d 175, 2004-Ohio-723, paragraph one of the syllabus.
 {¶ 12} The trial court found that appellant's affidavit did not constitute admissible evidence that Scotts replaced appellant with a younger employee. According to the court, appellant's affidavit, which alleged that 35-year-old Scotts employee Loretta Weeks replaced appellant in a substantial portion of her job, failed to indicate appellant's personal knowledge of the circumstances surrounding Weeks' hiring or job duties. The court additionally found that appellant's statistical evidence was inadequate to support her discrimination claim because it only considered the relevant employees' ages and management levels without considering other factors. The court rejected appellant's statement that she witnessed older workers being targeted for dismissal because this statement was not sufficient to support appellant's claim that Scotts subjected her to discriminatory tactics.
 {¶ 13} Our review of the depositions and affidavits submitted as part of the record before the trial court convinces us that the trial court properly concluded that appellant's evidence did not support a prima facie case. Appellant testified in her deposition that she believed age was a factor in her termination, but had no concrete information to support this belief. The following interchange took place:
Q. What led you to conclude that your tenure and your age were factors in the decision to terminate you?
A. I believe Scotts has a history of doing that to other people, long-term employees.
Q. Name one.
A. I don't currently recall any specific names.
Q. Do you have a list anywhere?
A. No, I do not.
Q. What led you to conclude that Scotts had a history of doing that?
A. Past hist- — I mean, the history of the company, other — rumors.
Q. Rumors that you had heard?
A. Correct.
Q. From other people at Scotts?
A. Correct.
Q. Had you personally observed Scotts doing that kind of thing to any employee on the basis of that person's age or tenure?
A. Not that I currently recall.
(Boggs Depo., 71-72.)
 {¶ 14} Thus, appellant was unable to recount any specific incidents in which Scotts' employment actions could be deemed discriminatory.
 {¶ 15} However, in support of her claim, she did submit a Scotts report indicating the ages and position levels of those who were subjected to the reduction in force ("RIF"). To interpret this evidence, appellant presented expert witness William I. Notz, a professor of statistics at The Ohio State University. Notz's affidavit stated, in part:
2. I have reviewed the attached Job and Age Profile provided by [Scotts] with respect to the Managers selected and not selected for the reduction in force * * *.
3. I find that the disparity in the proportion of those under the age of 40 who were selected for the reduction in force and the proportion of those over the age of 40 who were selected for the reduction in force to be statistically significant. Specifically, seven of the 128 managers under the age of 40 (5.49%) and 31 of the 159 managers over the age of 40 (19.50%) were selected. For these numbers of managers, a difference in the proportions this large or larger would happen simply by chance less than 1 in 1,000 times. Thus, the difference is statistically significant at the 0.001 level and cannot be plausibly contributed to chance.
4. I have reviewed the attached Analysis of Terminations v. Persons Considered provided by [Scotts] with respect to the employees selected and not selected for the reduction in force undertaken by [Scotts] in year 2001.
5. I have examined the data on the terminations by [Scotts] for the case of Boggs vs. the Scotts Company. First, I considered all employees. I compared the termination rate for those under 40 to the termination rate for those 40 and over. 48 out of 1491 employees under 40 (3.22%) were terminated and 73 out of 1219 employees 40 and over (5.99%) were terminated. The difference in the rates is statistically significant at the 0.05 level. In fact, the P-value for testing whether the rate for those under 40 was significantly less than those 40 and over is 0.0006 using Fisher's exact test (the standard test for such comparisons). In other words, a difference in the rates this large or larger would happen by chance only 6 in 10,000 times.
6. Next, I considered all officials and managers. I compared the termination rate for those under 40 to the termination rate for those 40 and over. 2 out of 81 employees under 40 (2.47%) were terminated and 17 out of 168 employees 40 and over (10.12%) were terminated. The difference in the rates is statistically significant at the 0.05 level. In fact, the Pvalue for testing whether the rate for those under 40 was significantly less than those 40 and over is 0.0434 using Fisher's exact test. In other words, a difference in the rates this large or larger would happen simply by chance less than 5 in 100 times.
7. Finally, I considered all salaried full-time employees. I compared the termination rate for those under 40 to the termination rate for those 40 and over. 46 out of 728 employees under 40 (6.32%) were terminated and 73 out of 697 employees 40 and over (10.47%) were terminated. The difference in the rates is statistically significant at the 0.05 level. In fact, the P-value for testing whether the rate for those under 40 was significantly less than those 40 and over is 0.0044 using Fisher's exact test. In other words, a difference in the rates this large or larger would happen simply by chance less than 5 in 1,000 times.
8. In all these cases, the termination rates for those 40 and over were higher than the rates for those under 40 and the discrepancy cannot plausibly be attributed to chance. In particular, this analysis demonstrates that the data are inconsistent with the assumption that age (40 and over versus under 40) was not a factor in the decision to terminate. Thus, this analysis suggests age was a factor in the decision to terminate.
 {¶ 16} In Dahl v. Battelle Memorial Institute, Franklin App. No. 03AP-1028, 2004-Ohio-3884, at ¶ 18, this court recently stated:
[T]he raw statistics presented by appellant simply do not present a sufficient level of specificity to support the inference of discrimination. Appellant's statistics do not account for variations among employees in skill level, job function, and education as variables that necessarily must be accounted for in establishing a probative value of the raw numbers given.
Thus, we recognized that unelaborated statistics that fail to consider independent variables such as job skills, education, experience, performance or self-selection, were insufficient to establish a material issue of fact. Id., citing Swiggum v. Ameritec Corp. (Sept. 30, 1999), Franklin App. No. 98AP-1031. In Swiggum, this court noted:
Statistical evidence may prove discrimination when it shows a pattern of conduct against a protected group that, if unrebutted, would allow the inference of intentional discrimination against individual members. * * * The statistics, however, must show a "significant disparity" and must eliminate the "most common nondiscriminatory explanations for the disparity." * * * They must also bear a logical connection to the facts and circumstances being analyzed. * * * "Unless the statistics, standing alone or in comparison, are sufficient to lead the mind naturally to the conclusion sought, they have no probative value; they do not move the proof one way or another."
Id., quoting Adams v. Indiana Bell Telephone Co., Inc. (S.D.Ind. 1998), 2 F.Supp.2d 1077, 1098.
 {¶ 17} In Baer v. The Scotts Co. (Dec. 6, 2001), Franklin App. No. 01AP-323, this court followed Swiggum in concluding that plaintiff's statistics failed to move the proof one way or another. We stated:
[Plaintiff] found a drop of two years in the average age of people in the department over a two year period. The size of the department ranged from seven people in 1997 to thirteen people in 1999. [Plaintiff's] small statistical sample and the failure to take into account any independent variables renders his statistical evidence insufficient to support an inference of discrimination.
 {¶ 18} Similarly, in the case at bar, Notz's affidavit indicates that he only looked at the number of persons above and below the age of 40 who were selected for termination. There is no indication that other data were available to him or were used in rendering his report. It may be that some of the departing employees over the age of 40 were terminated for legitimate reasons, such as poor performance or lack of appropriate skills. They may have been terminated in favor of retaining older employees, or they may have accepted early retirement. Other factors may have been involved, but looking only at the ages of those affected by the reduction in force does not indicate what those other factors were. Thus, appellant's statistical evidence was not probative of whether Scotts decided to terminate her employment based solely upon her age, and we agree with the trial court that summary judgment for Scotts on this question was proper.
 {¶ 19} Even if appellant presented sufficient evidence to establish a prima facie case of age discrimination, Scotts adequately rebutted by submitting evidence that appellant's termination was motivated by a legitimate business purpose. Wulff's affidavit verred that Scotts did not replace appellant; rather, Wulff assumed appellant's managerial duties, while some of her other duties were distributed to customer service representatives who had no management responsibilities and were at a lower pay grade than appellant. Human Resources Manager Kristen Black's affidavit reiterated this view, and added that one of the customer service representatives who had assumed some of appellant's job duties was older than appellant. PBG vice presidents William Kusey and David Flack submitted affidavits confirming that Scotts did implement a ten-percent RIF at the time of appellant's termination, and asserting that appellant's age had nothing to do with the decision to terminate her employment.
 {¶ 20} In addressing appellant's assertion that Scotts' legitimate business purpose was pretextual, the trial court stated:
* * * [I]n the present case, plaintiff neither argues nor presents evidence showing that Scotts' RIF was not legitimate, although she alleges that the RIF was used to improperly discharge plaintiff from employment. Furthermore, plaintiff has failed to present comments indicating possible age-discrimination or to otherwise "[come] forward with additional proof of age discrimination — specifically, some `direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" * * *
 {¶ 21} We agree with the trial court that appellant's evidence failed to raise an issue of fact as to whether her termination resulted from a discriminatory motive, and so overrule appellant's first assignment of error.
 {¶ 22} Appellant's second assignment of error asserts that the trial court erred in granting summary judgment on the question whether Scotts' retaliatory intent prompted her termination.
 {¶ 23} An employer may not retaliate against an employee who has opposed an unlawful discriminatory practice, or who has "made a charge * * * under R.C. 4112.01 through 4112.07." Peterson v. Buckeye Steel Casings
(1999), 133 Ohio App.3d 715, 727. To prove a claim of retaliation, appellant must be able to present evidence that: (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. See id. If she is able to establish a prima facie case of retaliation, the burden shifts to Scotts to articulate a legitimate reason for its action. Id. If Scotts does so, the burden then shifts back to appellant to demonstrate that the proffered reason was a pretext. Id. Even if appellant is able to establish a prima facie case of retaliation, she cannot prevail if the evidence demonstrates that Scotts would have made the same decision regardless of whether she participated in a protected activity. See Goad v. Sterling Commerce, Inc. (June 13, 2000), Franklin App. No. 99AP-321, quoting Neal v. Hamilton Cty. (1993),87 Ohio App.3d 670, 678.
 {¶ 24} Appellant asserts that her attorney's letter to Scotts and her complaint alleging age discrimination both constituted protected activity. She claims that her termination was an adverse employment action, and that its temporal proximity to Scotts' receipt of her attorney's letter supports a finding that retaliation motivated Scotts to terminate her.
 {¶ 25} We begin our analysis with the third element, that is, whether appellant presented evidence of a causal link between her protected activity and the alleged adverse action. Through her affidavit, appellant submitted evidence of the following: (1) Scotts management sought to move her to a new business group; (2) a Scotts human resources representative asked for management's advice on what to do with "the one we got the letter from"; (3) after her termination, some individuals at Scotts sought to have appellant re-hired, but "political as well as legal ramifications" prevented them from doing so; and (4) appellant did not receive the bonus she felt she deserved. We agree with the trial court that none of this evidence, even if admissible, shows a causal connection between appellant's attorney's letter and an adverse job action. As the trial court detailed, appellant presented no evidence of discriminatory intent, but relied instead upon generalizations, conclusory statements, and her own subject beliefs, none of which are sufficient to support a finding of discrimination or retaliation such that appellant could show the requisite causal link. See Hartsel v. Keys (C.A.6, 1996), 87 F.3d 795,801-802, certiorari denied (1997), 519 U.S. 1055; King v. Enron Capital Trade Resources Corp. (Apr. 5, 2001), Franklin App. No. 00AP-761;Cully v. St. Augustine Manor (Apr. 20, 1995), Cuyahoga App. No. 67601, appeal not allowed, 74 Ohio St.3d 1404, certiorari denied (1996),517 U.S. 1188.
 {¶ 26} We add, too, that temporal proximity alone does not support a claim of retaliation if there is no other compelling evidence. Aycox v.Columbus Bd. of Edn., Franklin App. No. 03AP-1285, 2005-Ohio-69, ¶ 20. Here, Scotts received appellant's counsel's letter in May 2001 and appellant was terminated in July 2001, a difference of at least two months. In Aycox, we followed federal cases holding that an interval of two months between complaint and adverse action so diluted any inference of causation that, without more, a retaliation claim could not stand. Id. at ¶ 21.
 {¶ 27} Finally, Scotts' evidence of a company-wide RIF strongly supported a finding that appellant's termination was inevitable, regardless of her counsel's letter. The changes in management structure that resulted in appellant's having to report to Wulff would have suggested to appellant that her position was not secure. Appellant herself admitted that she knew from events leading up to her termination that she would be a part of the RIF, and, in fact, had already begun removing her belongings from the premises. Thus, although her counsel's letter to Scotts' management was an attempt to improve her working conditions and procure for her a protected status in the face of the looming RIF, the facts indicate that Scotts viewed her position as redundant, changed its management structure so that she would report to Wulff as part of its efforts to streamline, and ultimately terminated her, all because of its financial difficulties rather than because it sought to discriminate or retaliate against her. In short, Scotts would have made the same decision regardless of whether appellant's counsel sent the letter. Therefore, we overrule appellant's second assignment of error.
 {¶ 28} Appellant's third assignment of error claims that the court erred in granting ummary judgment in favor of Scotts on the issue of promissory estoppel. Either party may terminate an employment-at-will relationship without cause and for any reason or no reason, so long as the termination is not otherwise contrary to law. Chapman v. AdiaServices, Inc. (1997), 116 Ohio App.3d 534, 541. The doctrine of promissory estoppel may be applied to at-will employment relationships where the employee is able to demonstrate that: (1) the employer made a representation of continued employment that could be deemed a promise; (2) the employee relied upon the promise; (3) that reliance was reasonable and foreseeable; and (4) the employee is injured as a result of his reliance. See Kelly v. Georgia-Pacific Corp. (1989),46 Ohio St.3d 134, paragraph three of the syllabus; Jelinek v. AbbottLaboratories (Sept. 13, 2001), Franklin App. No. 01AP-217. A promise of future benefits or opportunities must contain a specific promise of continued employment in order to merit a promissory estoppel exception to the employment-at-will doctrine. Wing, paragraph two of the syllabus.
 {¶ 29} In support of her promissory estoppel claim, appellant directs us to two specific incidents. First, appellant alleges that Boligala's boss, Louis deKort, who was at the time senior vice president of Scotts' PBG section, told her that she was an integral part of the team and would retain her managerial role. Second, she points out that Boligala promised her that her position was secure. She further asserts that both of these assurances came at a time when deKort and Boligala knew the company would be instituting the RIF. Appellant stated in her affidavit:
14. On November 15, 2000 I met with Louis deKort and Raju Boligala. I wanted to know why the decision was made that I would report to Ms. Wulff when earlier I was told that I would be Manager of the department. I also wanted to know their views regarding my responsibilities. Louis deKort stated that I was an integral part of the team, that I would retain my current role and that my position was secure. I did not look for another position within Scotts or with another employer. I received phone calls from headhunters. Because I was told my position was secure, I told them that I was not * * * pursuing other positions.
* * *
28. On April 3, 2001, I had a meeting with Raju Boligala regarding my position at Scotts and my growing concerns with my treatment. Mr. Boligala assured me that my position was secure.
 {¶ 30} These are appellant's only references to assurances by anyone at Scotts that appellant might continue in her position. The trial court determined that these statements were only statements of general praise, which did not rise to the level of a specific promise of continued employment. Following a line of cases interpreting such statements as failing to modify an at-will employment relationship, the trial court concluded that appellant's subjective interpretation of her supervisors' praise was insufficient to raise a genuine issue of fact regarding her promissory estoppel claim. Comparing the statements of Boligala and deKort as asserted by appellant with similar statements in this court's case ofBuren v. Karrington Health, Inc. (Jan. 17, 2002), Franklin App. No. 00AP-1414, we agree with the trial court that these statements were insufficient to establish the type of promise of future employment that can form a basis for a promissory estoppel claim. Therefore, we overrule appellant's third assignment of error.
 {¶ 31} Appellant's fourth assignment of error charges that the trial court erred in granting summary judgment on her spoliation claim. The elements of a cause of action for interference with or destruction of evidence are: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts[.]" Smith v.Howard Johnson Co., Inc. (1993), 67 Ohio St.3d 28, 29. Ohio does not recognize a cause of action for negligent spoliation; thus, in order to prove spoliation, the plaintiff must show willful or purposeful conduct by the defendant designed to disrupt or deter litigation. Id.; Barker v.Wal-Mart Stores, Inc. (Dec. 31, 2001), Franklin App. No. 01AP-658; Whitev. Ford Motor Co. (2001), 142 Ohio App.3d 384, 387-388; Drawl v.Cornicelli (1997), 124 Ohio App.3d 562.
 {¶ 32} In Drawl, supra, the court determined that because the defendant changed pertinent records in the normal course of her medical record-keeping, and the changes cited by the plaintiff as evidence of spoliation were the result of the defendant's updating of her files, the plaintiff had failed to demonstrate a willful interference with or destruction of evidence. Here, appellant complains about Scotts' human resources department's destruction of relevant documents and e-mails. However, according to Rosemary Smith's deposition, Smith did not shred documents that were considered significant to appellant's claims. In addition, Smith asserted that the destruction of papers was a part of her effort to clean out her office in preparation for voluntarily leaving Scotts in July 2001. During Smith's deposition, the following interchange took place:
Q. Why would you shred a file after an employee's lawyer had contacted the company complaining about treatment?
A. Because all that was in it was copies of the e-mails that Robbie has and then just you know a few notes that I had made.
Q. What do you recall about the notes that you made?
A. Just, for example, when I met with Robbie, kind of the highlights of what her issues were so that when I talked with either Raju or with Kristen, that I could adequately cover those areas.
Q. And why did you think those e-mails and the notes wouldn't be relevant to any claims Robbie was making through her counsel?
A. I guess I just cleaned them out when I was cleaning other things out. I cleaned out my whole office, every area of the office.
* * *
Q. Why wouldn't you just turn your files over to legal counsel or to your successor?
A. On Robbie, I just didn't think about that.
Q. And no one had contacted you and told you to forward whatever materials you had on Robbie?
A. No one had, right.
Q. Did anyone tell you to destroy your files?
A. No.
Q. Did anyone know you had files on Robbie?
A. Not that I know of. I mean, I didn't tell anybody I had one.
(Smith Depo., 45-47.)
 {¶ 33} This testimony does not support appellant's contention that Smith deliberately shredded documents in an effort to disrupt appellant's pending or probable litigation. Moreover, appellant has failed to produce convincing evidence that at the time Smith destroyed documents she, or anyone else at Scotts, knew that litigation was likely, since at that time the company was trying to address the concerns expressed in appellant's letter. Finally, appellant has not presented any evidence that her case, in fact, has been disrupted by the loss of any documents, nor that any damage to her has proximately resulted. Thus, we agree with the trial court that appellant has failed to raise a genuine issue of fact on her spoliation claim, and we overrule her fourth assignment of error.
 {¶ 34} Appellant's fifth assignment of error maintains that the trial court erred in excluding testimony contained in appellant's affidavit. According to appellant, the court abused its discretion because her statements were not offered for the truth of the matter asserted or qualified as exceptions under the hearsay rule.
 {¶ 35} The decision whether to admit or exclude evidence is subject to review under an abuse of discretion standard, and absent a clear showing that the court abused its discretion in a manner that materially prejudices a party, we will not disturb an evidentiary ruling.Sidenstricker v. Miller Pavement Maintenance, Inc., 158 Ohio App.3d 356,2004-Ohio-4653, ¶ 23; Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 65.
 {¶ 36} Here, the trial court devoted some 15 pages of its decision to a thorough analysis of each of the statements subject to being stricken. In each instance, the court carefully weighed the competing interests in determining whether to admit or exclude, crafted exclusions that struck only portions of a sentence or paragraph, and gave muliple grounds for its rulings. While appellant focuses her argument on the court's hearsay ruling, she fails to acknowledge that the court relied on numerous other grounds for striking the statements: appellant's inability to authenticate the documents at issue; her failure to cite the source or factual basis for the information; and her inclusion of generalities, personal opinion, legal conclusions, and conclusory, unsupported statements. Appellant offers no arguments in opposition to the court's relianc on these alternate grounds.
 {¶ 37} Moreover, while the trial court relied on federal case law to determine that appellant could not rely on deposition testimony of other witnesses to create her personal knowledge of that testimony, Ohio courts also have considered whether parties can make statements in an affidavit based on what they heard at a deposition. Ohio courts, including this court, have struck such statements as hearsay. See Streets v. ChesrowEnterprises, Franklin App. No. 03AP-577, 2004-Ohio-554, at ¶ 10; Fox v.City of Hubbard (Sept. 26, 1997), Trumbull App. No. 96-T-5453; Wall v.Firelands Radiology, Inc. (1995), 106 Ohio App.3d 313, 336-337, appeal not allowed (1996), 74 Ohio St.3d 1512. But at least one Ohio court has allowed such statements where they were offered against a party-opponent pursuant to Evid.R. 801(D)(2), which appellant argues applies here. See Fox, supra. In allowing the statements in Fox, the Eleventh District noted that "the better practice would have been to include a properly certified copy" of the deposition testimony. Id. In striking appellant's references to deposition testimony here, the trial court made similar observations, but went further, stating:
* * * The motion to strike is also warranted to the extent that plaintiff quotes or refers to deposition testimony or improperly-authenticated documents, although striking those parts ofplaintiff's affidavit would not be material in deciding defendants'summary-judgment motion to the extent that the documents or deposition testimony themselves set forth the same information and not merely plaintiff's characterization of the documents or testimony.
(Emphasis added.) Thus, the trial court's decision to strike the statements for lack of personal knowledge did not affect the admissibility of the testimony itself and, therefore, could not have materially prejudiced appellant.
 {¶ 38} For all of these reasons, our review of the court's extensive analysis convinces us that there was no abuse of discretion. Accordingly, we overrule appellant's fifth assignment of error.
 {¶ 39} Appellant's sixth assignment charges that the court erred in failing to compel discovery that, she argues, would have supported her claim that Scotts replaced her with a younger employee. In its decision denying appellant's motion to compel and for a continuance pursuant to Civ.R. 56(F), the trial court stated:
A status conference was held December 10, 2002. Subsequently, an entry ordering defendant to produce specified documents and respond to interrogatories was filed January 29, 2003. This entry states, "Plaintiff has agreed to limit the scope of her requests in order to expedite the discovery in this matter. Both parties reserve the right to seek judicial intervention if future discovery disputes arise." The entry also gave plaintiff twenty-one (21) days after those documents and responses to interrogatories were produced in which to respond to defendants' October 11, 2002 summary-judgment motion and gave defendants fourteen (14) days thereafter to file a reply.
On March 19, 2003, plaintiff filed her "Motion to Amend Case Schedule and Motion to Compel Discovery." On April 14, plaintiff filed her "Motion Pursuant to Civil Rule 56(F) for a continuance to Permit Discovery to be Completed and Plaintiff's Motion for Rule 11 Sanctions." Plaintiff seeks discovery beyond that which defendants have already provided.
In this regard, the Court declines to order defendants to provide discovery beyond that specified in the January 29, 2003 order. While the proper scope of discovery is broad, it is not unlimited. Defendants have provided extensive discovery, and requiring defendants to provide further discovery would be unduly burdensome. Thus, the Court declines to exercise its discretion to compel defendants to provide additional discovery. Plaintiff's motion for Civ.R. 11 sanctions is also unwarranted.
 {¶ 40} As to this assignment, Scotts argues, first, that it raises an improper discovery issue and, second, that the trial court did not abuse its discretion. Regardless of whether appellant properly articulated this assignment of error, the record shows no "unreasonable, arbitrary or unconscionable" attitude by the trial court. See Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. Rather, the record shows that the court continued the original discovery cut-off date by four months, thus giving appellant more than a year to conduct discovery before Scotts moved for summary judgment. During that time, appellant served, and received responses to, numerous sets of discovery requests. In addition, after Scotts filed its request for summary judgment, the court allowed appellant an additional ten months before requiring appellant to oppose Scotts' motion. Scotts maintains it produced more than 7,000 documents. Under these circumstances, where the trial court allowed such lengthy and extensive discovery, we cannot find that the court abused its discretion by refusing to compel more. Thus, we overrule appellant's sixth assignment of error.
 {¶ 41} Based upon all of the foregoing, we overrule appellant's six assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Sadler and Wright, JJ., concur.
WRIGHT, J., retired, of the Ohio Supreme Court, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Former Scotts employee, Harold K. Baer, also initiated an age discrimination action against Scotts. See Baer v. The Scotts Co. (Dec. 6, 2001), Franklin App. No. 01AP-323.
[2] R.C. 4112.02(A) provides: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
[3] R.C. 4112.02(I) provides: "It shall be an unlawful discriminatory practice: (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07
of the Revised Code."