[Cite as *Huffman v. Sunbelt Rentals, Inc.*, 2020-Ohio-5070.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JOHN HUFFMAN, | : | APPEAL NO. C-190642 |
| | | TRIAL NO. A-1804321 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| SUNBELT RENTALS, INC., | : | |
| | | |
| Defendant-Appellee. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  October 28, 2020

*Robert A. Klingler Co., L.P.A.*, and *Robert A. Klingler*, for Plaintiff-Appellant,

*Smith, Gambrell & Russell, LLP*, *Yash B. Dave* and *Patricia J. Hill*, for Defendant-Appellee.

**MOCK, Presiding Judge.**

{¶1} Plaintiff-appellant John Huffman sued his employer, defendant-appellee Sunbelt Rentals, Inc., ("Sunbelt") for retaliatory discharge and discrimination on the basis of race and age. After Huffman abandoned his claim for age discrimination, the trial court granted summary judgment in favor of Sunbelt on Huffman's remaining claims. Huffman now appeals, asserting two assignments of error. Because we hold that Huffman has failed to demonstrate a prima facie case of race discrimination and retaliation, we affirm the trial court's judgment.

### Background

{¶2} Sunbelt is in the business of selling, renting and servicing manufacturing, construction and industrial equipment through locations called "profit centers." Huffman, an African-American male, was hired by Sunbelt in 2006 as a parts manager at Profit Center 213 ("PC 213"). Shortly thereafter, he was promoted to service manager. As service manager, Huffman was placed on a performance improvement plan ("PIP") three separate times. The first time was in 2010, when he received a written warning and PIP for "[f]ailure to comply with general policies and procedures" and "discourteous, rude or unprofessional behavior or failure to interact courteously and tactfully." A year later he was placed on another PIP, which had goals to help Huffman improve his skills in the areas of organization, leadership, customer service and safety. Finally, Sunbelt placed Huffman on his third PIP in December of 2017, which ultimately led to his termination.

{¶3} As a service manager, Huffman's responsibilities included managing parts and inventory needed for repair and maintenance of the rental equipment and supervising the mechanics and yard personnel. The shop foreman, Chuck Brady, a

white male, began reporting to Huffman in 2015, after Huffman had returned from medical leave. Brady's duties included assisting Huffman in preparing work schedules, handling service calls to meet customer needs and assuring that equipment was available as required. The following year, Scott Rudolph, a white male, was promoted to manager of PC 213, and Huffman reported directly to him. In March 2017, Huffman reported to Sunbelt's human resources department that Brady and Rudolph were creating a hostile work environment by "disrespecting" him. First, he reported that Rudolph did not include him in the interview process when hiring a new mechanic. Rudolph testified in his deposition that he does not know why Huffman was not included in the interview but indicated after that time Huffman was included when interviewing new mechanics. Next, he reported that Brady had said things about him, such as "you're worthless, and good for nothing," and that Brady would not complete tasks that Huffman had assigned. For example, Huffman stated that Brady had not organized the ordered parts for the rental equipment as requested by Huffman. Huffman testified that the ordered parts were disorganized because Brady had mistakenly ordered unnecessary items for the rental equipment and instead of returning those items, he had left them on the shelves in the parts warehouse, creating an unorganized mess. Huffman testified that when he had reported this to Rudolph, Rudolph's response had been to move Brady to the rental department and out of the office he shared with Huffman. Brady testified that he had requested that his office be moved because he felt a lot of "tension" from Huffman because of the parts that had been mistakenly ordered and over Brady's lack of computer skills. After Brady moved to the rental department, he was assigned different job duties and no longer assisted with ordering parts for the equipment.

{¶4} Ann Marie Rice, a human resources manager at Sunbelt, testified that she and her coworker contacted every employee at PC 213 in response to Huffman's complaint. During this investigation, it became apparent to Rice that several people were responsible for issues of professionalism and communication at PC 213. As a result, Sunbelt issued "memos" to Huffman, Brady, and another employee, and one to the entire profit center, which required all employees to retake their "ethics training." The memo sent to Huffman reminded him to be more professional with coworkers, to wear the proper personal protective equipment and, as a leader at PC 213, to refrain from gossiping.

{¶5} In May 2017, Rudolph reported to Rice that he was having performance problems with Huffman. Rudolph reported that he had asked Huffman to order a part for equipment that was scheduled to be rented but Huffman refused, indicating he was too busy. Rudolph told him to stay late if necessary but Huffman refused. Later, Rudolph reported that another employee claimed Huffman said, "[T]ell [Brady] to suck my dick." Huffman denied saying this, and since Rice found the witness was not credible, Rice closed out the investigation.

{¶6} On December 4, 2017, Rice checked in with Huffman to see how he was doing. During this conversation, for the first time, Huffman reported racial tension at PC 213, and his belief that he was being discriminated against because of his race. To support his belief, Huffman reiterated that Brady would not complete work that Huffman assigned him and that he had overheard Brady use "the N-word" but that it was not in reference to Huffman and that Brady had apologized to Huffman. Brady denied this occurred. Huffman also reported that Rudolph had disciplined him (several months before) for texting that he was going to be absent from work, instead of following Sunbelt's policy of telephoning the profit center.

Following this incident, Huffman reported that another employee, a white male, had also texted Rudolph that he was going to be absent from work and that this employee had not been disciplined. However, Huffman admitted in his deposition that he did not know whether this employee had been disciplined for violating Sunbelt's policy.

{¶7} Huffman also reported that Rudolph treated other African-American employees poorly. Huffman reported that a former 60-year-old African-American employee was mistreated when Rudolph changed his duties to include assisting loading and unloading equipment. But Huffman admitted that he was aware that an employee's job duties can be changed. Next, Huffman reported that an African-American driver was treated unfairly because that employee had applied for the dispatcher position, which was not open, and did not receive the position. Huffman believed that the former employee should have received the job because he was senior and the current dispatcher was not knowledgeable.

{¶8} Rice investigated Huffman's claims of discrimination against him by talking to other employees at PC 213. During this investigation, Rudolph reported that he and Huffman had not been communicating regularly since Huffman had refused to stay late to complete ordering a needed part for the rental equipment. Another employee, Clarence Parsons, reported that Huffman treated Brady unfairly and had allegedly thrown a work order in Brady's face. Huffman denied this happened. Rice then met with Brady. She testified that Brady became emotional and tearful during the interview and reported that he wanted to step down as shop foreman because it was too stressful and tense working with Huffman.

{¶9} Rice testified that she could not investigate Huffman's claims with respect to the two former African-American employees because they had resigned. She believed there was significant interpersonal and communication issues that

5

needed to be corrected in order for PC 213 to operate effectively. She testified that she spoke with Huffman, and he wanted to improve communication at PC 213 and his relationships with Rudolph and Brady.

{¶10} In response, Sunbelt placed Huffman on a PIP on December 6, 2017, and a few days later Sunbelt placed Rudolph, Huffman's supervisor, on a PIP. Under Huffman's PIP, Huffman was to clean and organize the parts warehouse within 30 days, communicate daily with the shop foreman and profit center manager about concerns he had, be more visible in the shop and yard, focus on processing warranty claims and updating the computer system daily, and spot check equipment to help decrease or eliminate the number of first-day breakdowns. Huffman agreed that all of these duties were part of his job as a service manager.

{¶11} Under the PIP, Huffman was to be evaluated at 30, 60 and 90 days, but Rice testified that she had informed Huffman from the beginning that there would also be weekly meetings to discuss his progress. Rice testified that because of Huffman's report of discrimination, she wanted to ensure that Huffman was evaluated fairly so she, via telephone, and Todd Sprinkle, the assistant manager at PC 213, whom Huffman felt comfortable with, were present at the weekly meetings. Rudolph and Ryan Balcom, Sunbelt's district manager for the greater-Cincinnati area, were also present at the meetings. Balcom had previously been the manager of PC 213 and had worked with Huffman.

{¶12} At the first evaluation meeting, Huffman was informed that he needed to be more visible in the shop and yard. Although Huffman had said he had walked the shop, Rudolph reported that he had not seen Huffman do so. Huffman then informed Sunbelt that he needed assistance with completing his job duties in order to be visible in the shop. Huffman requested Brady's assistance, but Rudolph said

6

that Brady was unavailable to help as he was focusing on other duties. Rudolph offered to assign a customer service representative ("CSR") to assist if Huffman would submit a plan describing the specific ways the CSR would help him complete his work. Huffman never submitted or presented this plan to Rudolph or Rice.

{¶13} At the first evaluation meeting in January 2018, Rudolph stated that Huffman had not involved him in the morning meetings/huddles or walking the shop and yard. At the next meeting, Huffman again requested help with completing his duties, but Rudolph stated that Sunbelt still needed a plan from Huffman as to how he would use a CSR to assist him. At this time, Balcom expressed concern that Huffman was not doing what they had asked. Balcom said that Huffman needed "to be running warranty reports, claim reports, the shop, communicating to the team." Huffman was instructed to find a balance between being more visible in the shop and yard and organizing the parts warehouse. Rice testified that she spoke with Huffman separately after the meeting to impress upon him that he needed to start meeting the goals in his PIP; otherwise, he could be disciplined or fired. Huffman reported that he had been walking the floor more and that Rudolph had simply not noticed.

{¶14} At the following weekly meeting, Rudolph reported that Huffman had finally started to discuss the status of the shop with him, but Huffman's visibility in the shop and involvement in huddles was still not occurring and the parts warehouse was still unorganized. Therefore, Huffman was given a written warning. Rice again noted that Huffman still had not presented a plan to Rudolph as to how Huffman would utilize an extra employee.

{¶15} A week later, Huffman had made no further progress on the stated goals in the PIP, and his employment was terminated as of February 9, 2018. After Huffman's termination, Brady testified in his deposition, the service-manager job

duties were split between himself and Sprinkle, the assistant manager. Thirteen months later, the new profit center manager (Rudolph had left Sunbelt to pursue other opportunities) hired a white male for the position of service manager.

## Summary Judgment

{¶16} In his two assignments of error, Huffman contends that the trial court erred in entering summary judgment in favor of Sunbelt on his claims for race discrimination and retaliatory discharge.

{¶17} We review a grant of summary judgment de novo, and will uphold it when (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion was made, that conclusion is adverse to that party. *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 13.

## Race

{¶18} The Supreme Court of Ohio has explained that discrimination actions under federal and state law require the same analysis. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981). Therefore, Ohio courts may look to both state and federal law when determining the rights of litigants under state discrimination laws.

{¶19} Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), when a court is presented with a claim for disparate treatment, it must undertake a three-part analysis. First, the plaintiff must establish a prima facie case of racial discrimination by a preponderance of the evidence. Second, if a prima facie case is established, the burden of production shifts

to the employer to articulate some legitimate, nondiscriminatory reason for its actions. If the employer articulates a nondiscriminatory reason for its adverse employment action, the burden shifts back to the plaintiff to prove the employer's stated reason was in fact pretext, masking unlawful discrimination.

{¶20} To demonstrate a prima facie case of racial discrimination, Huffman had to demonstrate that he (1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position either lost or not gained, and (4) that the position was filled by a person not of the protected class. *Swann v. Cardiology Assocs. of Cincinnati*, 1st Dist. Hamilton No. C-050650, 2006-Ohio-2758, ¶ 26. Establishing a prima facie case " 'creates a presumption that the employer unlawfully discriminated against the employee.' " *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, 837 N.E.2d 1169, ¶ 11, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

{¶21} There is no dispute that Huffman satisfied the first two prongs of the prima facie case as he is an African-American, and his employment with Sunbelt was terminated. With respect to the third requirement regarding qualification, the trial court determined that Huffman was not qualified for the position of service manager because he failed to organize the parts warehouse, one of the goals of his PIP. But failure to show progress under the PIP was Sunbelt's stated reason for terminating Huffman's employment. "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Wexler v. White's Fine*

*Furniture, Inc.*, 317 F.3d 564, 574-575 (6th Cir.2003), citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-661 (6th Cir.2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."); *Smith v. Children's Aid Soc.*, 8th Dist. Cuyahoga No. 86644, 2006-Ohio-4754 (court could not consider plaintiff's poor job performance as evidence that she was unqualified for former position when employer's reason for discharge was her poor job performance).

{¶22} Because a court may not consider the nondiscriminatory reason for the discharge at the prima-facie stage, then a court must analyze whether an employee was qualified for his former position by considering "the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Wexler* at 576. Huffman presented evidence that Sunbelt hired him in 2006 and shortly thereafter promoted him to service manager, a position he has held for over 11 years. Given the length of time that Huffman had previously served as a service manager and his familiarity with this industry, we hold that he was, prior to Sunbelt's assertion of his poor job performance, qualified for the position of service manager.

{¶23} Turning now to the final prong of the prima-facie case, regarding whether Huffman was replaced by a person from the nonprotected class, we note that Huffman argued below that he met this prong because it is undisputed that 13 months after Huffman was terminated, Sunbelt hired a white male for the position of service manager. But Sunbelt contends that Huffman cannot be considered replaced, when the position of service manager was not filled until over a year after

10

Huffman was discharged and when, during that time period, Huffman's former duties were spread out among the remaining employees. We agree.

{¶24} A former employee is not replaced when another employee is assigned to perform the former employee's job duties in addition to other duties; a plaintiff-employee is only replaced when another employee is hired or reassigned to *solely* perform the plaintiff's duties. (Citations omitted.) *Valentine v. Westshore Primary Care Assoc.*, 8th Dist. Cuyahoga No. 89999, 2008-Ohio-4450, ¶ 86. In *Valentine*, the plaintiff's duties were redistributed among remaining employees, in addition to their other duties, and the employer eventually hired an employee to perform the plaintiff's former job duties, but not until a year after the plaintiff had been fired. The Eighth Appellate District held that someone hired more than a year after the plaintiff was terminated does not create an inference, as a matter of law, that the new employee "replaced" the plaintiff. *Id.* at ¶ 87; *See Howell v. Whitehurst Co.*, 6th Dist. Lucas No. L-05-1154, 2005-Ohio-6136, ¶ 17 (fourth prong of a prima-facie case is established only if the plaintiff can show "upon her discharge" or near the time of termination, that plaintiff was replaced by someone outside the protected class).

{¶25} Here, the record demonstrates that upon Huffman's discharge his job duties were assigned to Brady and Sprinkle, in addition to their other responsibilities, and that Sunbelt did not hire an employee as service manager until over a year after Huffman's termination. Based on these circumstances, we hold that Huffman has not demonstrated an inference that he was replaced upon his termination, and thus, has not demonstrated a prima-facie case of racial discrimination.

11

**Retaliatory Discharge**

**{¶26}** To prove a claim of retaliation, Huffman must establish three elements: (1) that he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action. *Mendlovic v. Life Line Screening of Am., Ltd.*, 173 Ohio App.3d 46, 2007-Ohio-4674, 877 N.E.3d 377, ¶ 38 (8th Dist.).

**{¶27}** This court has stated that a causal relationship between the protected activity and the adverse employment action can be demonstrated through "evidence of the employer's knowledge of the protected activity, together with temporal proximity." *Widmyer v. Steak N Shake Operations, Inc.*, 1st Dist. Hamilton No. C-140231, 2014-Ohio-5413, ¶ 23; *Clark Cty. School Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (noting that some cases have "accept[ed] mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality" but that they have only done so when the temporal proximity is "very close"); *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4978, 840 N.E.2d 236, ¶ 29 (8th Dist.) (two-day interval); *Thatcher v. Goodwill Industries of Akron*, 117 Ohio App.3d 525, 690 N.E.2d 1320 (9th Dist.1997) (three-week interval).

**{¶28}** On the other hand, where some time elapses between the employer's discovery of the protected activity and the adverse employment action, the employee must produce other evidence of retaliatory conduct to establish causality. *Hall v. Banc One Mgt. Corp.*, 10th Dist. Franklin No. 04AP-905, 2006-Ohio-913, ¶ 47 (an "interval of two months between complaint and adverse action 'so dilutes any inference to causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in employee's favor on the matter of a

12

causal link' "); *Ningard v. Shin-Etsu Silicones*, 9th Dist. Summit No. 24524, 2009-Ohio-3171, ¶ 17 (no causal link where events separated by more than a few days or weeks); *Boggs v. Scotts Co.*, 10th Dist. Franklin No. 04AP-425, 2005-Ohio-1264, ¶ 26 (additional evidence required after two-month interval).

{¶29} The record demonstrates that Huffman engaged in protected activity when he reported racial tension to Sunbelt on December 4, 2017, and that Huffman suffered an adverse employment action when he was fired on February 9, 2019. Thus, there was more than a two-month interval between Huffman's protected activity of reporting racial tension and his termination. Huffman needed to present other evidence to support an inference that his report of racial tension is what caused his termination, and he has not done so. Because of the lack of temporal proximity between the protected activity and Huffman's termination, we are constrained to hold that Huffman has not met his burden of production with respect to the third prong of a prima-facie case for retaliatory discharge.

{¶30} Because Huffman cannot demonstrate a prima-facie case for his claims of racial discrimination and retaliatory discharge, we overrule both of his assignments of error, and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.