OPINION
{¶ 1} Plaintiff-appellant, Anne L. Hall ("Hall"), appeals from various judgments of the Franklin County Court of Common Pleas, including: entry of summary judgment in favor of defendants-appellees, Banc One Management Corporation, Bank One Corporation, Verne G. Istock, and Gerald E. Buldak (collectively "appellees"), on Hall's claims of age discrimination and retaliation; judgment on a jury verdict in appellees' favor on Hall's claim of sex discrimination; denial of Hall's motion for reconsideration; and denial of Hall's motion for a new trial. Hall also appeals from the trial court's rulings on discovery issues and during voir dire.
 {¶ 2} When Bank One Corporation ("Bank One") terminated Hall's employment in March 2000, Hall, age 47, had been an employee of Bank One or Banc One Management Corporation ("BOMC") for over 15 years. In July 1984, BOMC, a wholly owned subsidiary of Banc One Corporation ("Banc One"), hired Hall to oversee community relations for Chairman and CEO John B. McCoy ("McCoy"). Within six months, Hall began reporting directly to McCoy.
 {¶ 3} In 1994, McCoy separated Banc One's government relations functions from its legal department and appointed Hall as Director of the Government Relations Group. In that position, Hall established and maintained Banc One's Key Contact Network and Grassroots Program, served as Chairperson of Banc One's Political Action Committee ("BOPAC"), worked to decentralize distributions of contributions from BOPAC, and maintained responsibility for annual BOPAC solicitation campaigns. Hall was also responsible for overseeing the bank's federal, state, and local government relations, which included lobbying on Banc One's behalf. Until October 1998, Hall held the title of Vice President and Director of Community and Government Relations and reported directly to McCoy.
 {¶ 4} On October 2, 1998, a merger was finalized between Banc One and First Chicago NBD Corporation ("FCNBD"). After the merger, McCoy served as President and CEO of the merged entity, known as Bank One. Verne G. Istock ("Istock"), formerly FCNBD's Chairman and CEO, served as Bank One's Chairman. In October 1999, Istock took over as Bank One's President, while McCoy assumed the role of Chairman and maintained his position as CEO. Hall alleges that, after the merger, she was systematically discriminated against on the basis of her sex and age, and that, when she complained of such discrimination, Istock and Gerald E. Buldak ("Buldak"), Senior Vice President of Public Affairs, retaliated against her.
 {¶ 5} Despite significant differences between their philosophies about the role of government relations in a banking entity, McCoy and Istock decided that Bank One would adopt Banc One's government relations program and selected Hall to head the department. After the merger, Hall's responsibilities increased due to the bank's larger size and market share. When Hall assumed responsibility for the merged bank's Government Relations Group, she received a lesser title, First Vice President, and a smaller total compensation package than the head of FCNBD's Government Relations Group held before the merger. After the merger, rather than reporting to the Chairman as she had done through most of her tenure at Banc One, Hall was instructed to report to Buldak.
 {¶ 6} When Hall assumed leadership of Bank One's Government Relations Group, Buldak told her that she would take over John Currie's former corner, lake-view office in Chicago. However, within six months of her moving into Currie's former office, Buldak relocated Hall to a "hotel office." Buldak also attempted to displace Hall from her corner office in Columbus, but Hall worked out an alternate arrangement with facilities personnel in Columbus.
 {¶ 7} During the first half of 1999, Hall spent most of her time in Washington D.C., lobbying Congress in favor of HR-10, also known as the Gramm-Leach Bliley Act ("HR-10"), which Congress passed in the fall of 1999. The most comprehensive overhaul of the financial services industry since the 1930s, HR-10 authorized bank holding companies to affiliate with any financial company and to cross-sell an affiliate's products. McCoy characterized Hall's role in the passage of HR-10 as key. After the passage of HR-10, Hall significantly reduced her time in Washington and focused on local and state operations to review government relations programs and expenses.
 {¶ 8} In the summer of 1999, Bank One began experiencing financial difficulties, and its stock suffered as a result of problems facing its First USA credit card operations. Istock testified that the magnitude of the problem with First USA dictated significant cuts across the board, including charging all departments to cut costs. In preparation for a presentation of its 2000 financial plan to the analyst community in January 2000, Bank One "eliminated a bunch of jobs." (Istock Depo. at 97.) Bank One eliminated "a lot more jobs" when, after Hall's termination, Jamie Dimon assumed the position of Bank One's CEO. Id.
 {¶ 9} On December 21, 1999, McCoy announced that he would step down as Bank One's Chairman and CEO, and Istock assumed the role of acting CEO while Bank One searched for a permanent replacement for McCoy. Hall was shocked by McCoy's resignation and, in e-mail communications with Buldak, admitted her challenge in adjusting to McCoy's resignation and asked if he and Istock wanted her to step aside. Hall admits that she was "concerned about [her] situation because [she] had not been treated fairly by Istock and Buldak." (Hall Affidavit at ¶ 71.) Nevertheless, Hall moved forward with the Government Relations Group into 2000. In January 2000, Hall began reevaluating Bank One's relationships in its 14 states vis-à-vis the state banking associations, and that activity required Hall to travel at least a couple days per week.
 {¶ 10} On January 7, 2000, Hall's attorney wrote to Buldak, voicing Hall's concerns about discriminatory treatment and requesting that any discussion of Hall's employment be directed to him. A week later, on January 13, 2000, Hall attended a meeting with Istock and Buldak in Chicago, where they discussed the future of the Government Relations Group, including the necessity of Bank One maintaining visible representation in Washington, the cost of supporting such a program, and the amount of emphasis to be placed on BOPAC. Istock directed Buldak and Hall to compile additional information on the costs of the government relations program and to suggest means to curtail costs. Istock requested that Hall and Buldak put together information about the government relations program, including the BOPAC campaign, to share with him at a follow-up meeting in March 2000.
 {¶ 11} After the January 13, 2000 meeting, Hall and Buldak communicated primarily via e-mail. Buldak states that Hall "felt very strongly that the bank should continue its current government relations programs" and that "she became very stern in her position, very rigid, and it was clear that she was going in another direction." (Buldak Depo. at 70, 72.) In a February 25, 2000 e-mail to Buldak, Hall wrote:
* * * [R]egardless of who is the GRG Director, at our meeting in March, I want to know:
a) will [Bank One] have a 2000 [BOPAC] campaign with the CEO's commitment to raise more than we raised in 1999 * * *?
b) will the BOPAC Key Contact program continue as described in my memo to JBMc of months/years ago?
c) will BOPAC continue to be superior and state-of-the-art in [Bank One's] Grassroots Network? * * *
If your answer to any of the above is "no" then we should contact my attorney.
Buldak states that, after looking at the available data and corporate priorities, management made the decision to restructure the government relations program.
 {¶ 12} In March 2000, Hall met with Buldak in Chicago. Hall was prepared to discuss her proposal for government relations, including means for reducing costs, before their follow-up meeting with Istock. At that meeting, Buldak summarily advised Hall that her position was being eliminated, instructed her to discuss the terms of her severance with human resources, and informed her that Barbara Stewart ("Stewart") would be the new head of government relations. Hall had hired Stewart, who was less than 40 years old, approximately six months before. In an e-mail dated March 16, 2000, Buldak announced that Stewart would assume leadership of the Government Relations Group.
 {¶ 13} On April 19, 2000, Hall filed her complaint against appellees in the Franklin County Court of Common Pleas, alleging claims of age discrimination, sex discrimination, and retaliation, in violation of R.C. 4112.02. After significant discovery, appellees moved for summary judgment on Hall's claims. On November 17, 2003, the trial court granted appellees' motion for summary judgment on Hall's age discrimination and retaliation claims, but denied appellees' motion with respect to Hall's sex discrimination claim. On December 22, 2003, Hall filed a motion for reconsideration. After a four-week trial, a jury returned a verdict in appellees' favor on Hall's sex discrimination claim. On April 16, 2004, the trial court denied Hall's motion for reconsideration and, based on its summary judgment decision and the jury verdict, entered judgment in appellees' favor on all of Hall's claims. On April 29, 2004, Hall filed a motion for a new trial, which the trial court denied in a decision filed July 2, 2004, and judgment entry filed August 5, 2004.
 {¶ 14} Hall raises the following assignments of error:
I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF AGE DISCRIMINATION.
II. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM.
III. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY REFUSING TO PROVIDE AN IMPARTIAL JURY.
IV. THE TRIAL COURT ERRED IN FAILING TO COMPEL DISCOVERY.
 {¶ 15} In her first two assignments of error, Hall argues that the trial court erred by granting summary judgment on her age discrimination and retaliation claims. Appellate review of summary judgment is de novo. Koos v. Cent. Ohio Cellular, Inc.
(1994), 94 Ohio App.3d 579, 588, citing Brown v. Scioto Bd. ofCommrs. (1993), 87 Ohio App.3d 704, 711. Thus, we apply the same standard as the trial court and conduct an independent review, without deference to the trial court's determination. Maust v.Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107; Brown
at 711.
 {¶ 16} Pursuant to Civ.R. 56(C), summary judgment shall be rendered if:
* * * [T]he pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *
Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party. Harless v.Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66.
* * * [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. * * *
Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. Once the moving party meets its initial burden, the non-movant bears a reciprocal burden to produce competent evidence of the types listed in Civ.R. 56(C) showing that there is a genuine issue for trial. Id.; Civ.R. 56(E). Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the non-moving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356,358-359.
 {¶ 17} In her first assignment of error, Hall contends that the trial court erred by granting summary judgment on her age discrimination claim. Hall alleges that appellees discriminated against her based on her age in violation of R.C. 4112.02, which makes it unlawful for an employer to discharge without cause or otherwise discriminate against a person with respect to any matter related to employment on the basis of age.
 {¶ 18} To prevail on an employment discrimination claim, the plaintiff must prove discriminatory intent. Mauzy v. KellyServices, Inc. (1996), 75 Ohio St.3d 578, 583. In an age discrimination case, Ohio courts follow the burden-shifting analytical framework set forth in McDonnell Douglas Corp. v.Green (1973), 411 U.S. 792. Barker v. Scovill, Inc. (1983),6 Ohio St.3d 146, 147-148. If a plaintiff establishes a prima facie case of age discrimination, the defendant-employer may overcome the presumption of discrimination inherent therein by articulating a legitimate, non-discriminatory reason for the plaintiff's discharge. Id. at paragraph one of the syllabus. Finally, the plaintiff must have the opportunity to show that the defendant's proffered rationale was a pretext for unlawful discrimination. Id.
 {¶ 19} A plaintiff may directly establish a prima facie case of age discrimination by presenting evidence of any nature, direct or circumstantial, to show that the employer more likely than not was motivated by discriminatory animus. Mauzy at 586-587. Alternatively, a plaintiff may indirectly establish a prima facie case of age discrimination by demonstrating:
* * * (1) [T]hat he or she was a member of the statutorily protected class, (2) that he or she was discharged, (3) that he or she was qualified for the position, and (4) that he or she was replaced by, or that the discharge permitted the retention of, a person not belonging to the protected class. * * *
Kohmescher v. Kroger Co. (1991), 61 Ohio St.3d 501, syllabus. The four-part Kohmescher standard is a descendant of the prima facie standard established in McDonnell Douglas. Coryell v. BankOne Trust Co. N.A., 101 Ohio St.3d 175, 2004-Ohio-723, at ¶ 9. Subsequent to the trial court's ruling on appellees' motion for summary judgment, the Supreme Court of Ohio modified the fourth prong of a prima facie case of age discrimination to require the plaintiff to demonstrate that he or she "was replaced by, or the discharge permitted the retention of, a person of substantially younger age[,]" rather than a person outside the protected class. Id. at paragraph one of the syllabus.
 {¶ 20} Here, Hall attempts to indirectly establish a prima facie case. Neither the parties nor the trial court disputed that Hall established the first three elements of her prima facie case of age discrimination. It is undisputed that Hall was a member of the protected class and was discharged from a position for which she was qualified. However, on summary judgment, appellees argued that Hall failed to establish that she was replaced and, therefore, failed to make out a prima facie case. The trial court concluded that appellees eliminated Hall's position and did not replace her.
 {¶ 21} In the context of R.C. 4112.02, "[a] person is ` replaced' only when another employee is hired or reassigned to perform that person's duties." Atkinson v. Internatl.Technegroup, Inc. (1995), 106 Ohio App.3d 349, 359. "A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." Id., citing Barnes v. GenCorp, Inc.
(C.A.6, 1990), 896 F.2d 1457, 1465, certiorari denied,498 U.S. 878. Hall argues that Stewart, who was not a member of the protected class, replaced her, whereas appellees argue that Stewart did not assume all of Hall's duties and, therefore, did not replace Hall. The trial court found that appellees redistributed Hall's duties among existing employees already performing related work and, therefore, did not replace Hall. Thus, the trial court concluded that Hall failed to establish a prima facie case of age discrimination.
 {¶ 22} Upon careful review of the record, we find that the trial court erred in concluding, as a matter of law, that Stewart did not replace Hall. As head of Bank One's government relations, Stewart assumed responsibility for "broader management of the [government relations] group and the bank's Washington presence." (Stewart Depo. at 4.) Although Bank One purportedly de-emphasized BOPAC after Hall's termination, Stewart assumed Hall's former position as Chairperson of BOPAC, Hall's former functions in coordinating BOPAC activities, and Hall's former responsibility for the annual BOPAC solicitation campaign. Like Hall before her, Stewart was in charge of Bank One's federal, state, and local government relations, and all government relations personnel reported to her. Stewart was unaware of any of Hall's former functions, other than direct lobbying of members of Congress, that she herself did not perform after assuming leadership of the Government Relations Group.
 {¶ 23} In support of their position that Stewart did not replace Hall, appellees argue that Stewart did not assume Hall's responsibility for lobbying efforts in Washington. Rather, they contend that, as part of its restructuring of the Government Relations Group, they relied on industry organizations, such as the American Bankers' Association, to represent Bank One's position in Washington. Despite the purported reduction of Bank One's direct presence in Washington, Stewart's responsibilities admittedly encompassed the bank's Washington presence, as Hall's responsibilities had previously. Initially, Stewart spent less time in Washington than Hall had, but within months after Hall's termination, Stewart began increasing her involvement in Washington activities on behalf of Bank One. Between March 2000 and January 2001, Stewart visited Washington an estimated 10 to 20 times. In Washington, Stewart participated in government relations oriented groups with the Financial Services Roundtable, the American Bankers Association, or the Financial Services Forum, met with congressional delegations from states in which Bank One maintained a presence, and attended fundraisers. Carter McDowell ("McDowell"), who worked with Hall as legislative counsel for the Office of Public Policy, testified that Stewart represents Bank One in Washington as "the person in charge of government relations and lobbying on behalf of Bank One" and that Stewart essentially heads the department that Hall had headed before. (McDowell Depo. at 73.)
 {¶ 24} Appellees argue that, when the necessity arose for representation in Washington after Hall's termination, such responsibilities were split between McDowell and Julia Johnson ("Johnson"). For approximately one year after Hall's termination, McDowell served as Bank One's Washington representative. Having worked with Hall extensively on lobbying support for HR-10, McDowell continued to represent Bank One in Washington at Stewart's request and reported to Stewart with respect to his lobbying activities. McDowell spent a portion of his time in Washington introducing Stewart to people from the trade associations and on Capitol Hill. The fact that Stewart, who has less experience in the federal arena than Hall, delegated certain duties to McDowell does not alter the fact that Stewart maintained ultimate responsibility for overseeing Bank One's federal government relations, whether Bank One exerted its position directly or through industry organizations. As Bank One's Chief Privacy Officer, Johnson worked with Hall on the passage of HR-10, providing subject-matter expertise on privacy issues. Johnson did not report to Hall or to Stewart, and the record contains no evidence that her duties or responsibilities changed after Hall's termination. Thus, the evidence demonstrates that Stewart assumed Hall's supervisory responsibilities over the bank's government relations on the federal, state, and local levels in addition to assuming Hall's responsibilities with respect to BOPAC.
 {¶ 25} The record is clear that appellees assigned a substantial portion, if not all, of Hall's former responsibilities to Stewart. See Estes v. Tecumseh Products Co.
(Apr. 12, 1996), Lucas App. No. L-95-231 (prima facie case of age discrimination established where plaintiff presented evidence that a substantial portion of his job duties were assumed by younger employees); Kirkendall v. Parker Hannifin Corp. (July 12, 1995), Lorain App. No. 94CA005955 (issue of fact as to whether plaintiff was replaced existed where another employee assumed the majority of the duties plaintiff previously performed). Viewing the evidence before the trial court on summary judgment in the light most favorable to Hall, reasonable minds could conclude that Stewart replaced Hall.
 {¶ 26} Because they assert that Hall's termination was part of a reduction in force brought on by economic necessity, appellees argue that Hall must present additional direct, circumstantial or statistical evidence tending to indicate that appellees singled her out for impermissible reasons to establish a prima facie case of age discrimination. In Barnes, the Sixth Circuit noted that, in a true work force reduction situation, where the employer has eliminated the plaintiff's position, the plaintiff is not replaced. Therefore, the Sixth Circuit held that, to establish a prima facie case of age discrimination arising out of a reduction in force, where the plaintiff was not replaced, a plaintiff must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Id. at 1465. Likewise, this court has held that, in an age discrimination case arising out of a reduction in force, the plaintiff carries a greater burden of supporting his or her allegations with additional evidence to establish that age was a factor in the termination. Dahl v.Battelle Mem. Inst., Franklin App. No. 03AP-1028,2004-Ohio-3884, at ¶ 15.
 {¶ 27} Confronted with this additional prima facie requirement in a reduction in force case, plaintiffs often present statistical evidence in an attempt to establish that age was a factor in the termination. See Dahl; Boggs v. ScottsCo., Franklin App. No. 04AP-425, 2005-Ohio-1264; Ramacciato v.Argo-Tech Corp., Cuyahoga App. No. 84557, 2005-Ohio-506. However, a plaintiff can meet the heightened prima facie burden in a reduction in force case through other direct or circumstantial evidence that the employer singled out the plaintiff for impermissible reasons. For example, while recognizing the insufficiency of evidence that the employer retained younger persons in other jobs that the plaintiff was qualified to perform, the Sixth Circuit stated that a plaintiff can establish the final element of a prima facie case in a work force reduction case by showing that she possesses qualifications superior to those of a younger, retained co-worker working in the same position as the plaintiff. Barnes at 1466; see, also,Williams v. Gen. Elec. Co. (S.D.Ohio, 2003), 269 F.Supp.2d 958,967 (plaintiff could meet higher prima facie requirement by presenting additional evidence that he was more qualified than younger employees employer did not terminate).
 {¶ 28} Following Barnes and Williams, the Twelfth District Court of Appeals has held that a plaintiff can make out the final element of a prima facie case of age discrimination in a reduction in force scenario where the evidence demonstrates that the plaintiff was more qualified than the younger co-worker who replaced her or was otherwise retained. Hoffman v. CHSHO,Inc., Clermont App. No. CA2004-09-072, 2005-Ohio-3909, at ¶ 24. In Hoffman, the court stated that the jury could conclude that the plaintiff was more qualified than the younger retained employee, based on evidence that the plaintiff possessed far greater professional experience than the retained employee, and that such evidence was sufficient to establish a prima facie case. Id. at ¶ 25-26. In this case, even if no genuine issue of material fact existed as to whether Stewart replaced Hall for purposes of the traditional prima facie case, reasonable minds could only conclude from the evidence in the record that Hall was more qualified to lead the Government Relations Group than Stewart. Thus, whether under the traditional analysis or a reduction in force analysis, we conclude that the trial court erred in determining, as a matter of law, that Hall failed to establish a prima facie case of age discrimination.
 {¶ 29} Although the trial court's analysis of Hall's age discrimination claim ended with its conclusion that Hall failed to establish a prima facie case, we must proceed through theBarker burden-shifting analysis to determine whether summary judgment was nevertheless warranted.
 {¶ 30} While noting that McCoy's resignation had "led to a significant change in [appellant's] role at the bank[,]" appellees offered to the trial court only one reason for appellant's elimination: "a reduction-in-force brought on by economic necessity." The following passage from appellees' motion for summary judgment represents the heart of appellees' argument and the evidence upon which they relied:
* * * Istock proceeded to exercise his discretion and responsibilities as acting CEO to revise the function of the Government Relations Department to meet his leadership goals. In addition, he gave his attention to developing cost-saving measures within the Public Affairs [D]epartment. Accordingly, Istock directed Jerry Buldak to come up with a proposal to restructure the Government Relations Department. (Buldak Dep. pp. 67-69). In keeping with prior actions, Istock decided to utilize industry associations to effectuate its lobbying needs and to make other modifications to various programs managed by the Government Relations Department, such as the PAC. (Buldak Dep., pp. 94-95; Istock Dep., pp. 100-01.) In light of these changes to the organization and function of the Government Relations Department, it became clear that Plaintiff's position as it existed pre-merger was no longer necessary, especially in light of Plaintiff's stated refusal to change. Accordingly, Bank One eliminated Plaintiff's job and placed Ms. Stewart in charge of Government Relations, where she focused almost entirely on state issues as she had done before. (Buldak Dep. pp. 77-78; Istock Dep. p. 101.)
Thus, appellees clearly met their burden of articulating a non-discriminatory reason for terminating Hall, asserting that they eliminated her position as part of a reduction in force brought on by economic necessity. Accordingly, we now turn to Hall's evidence of pretext.
 {¶ 31} Once a defendant produces sufficient evidence to support a non-discriminatory reason for its action, the plaintiff has the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." TexasDept. of Comm. Affairs v. Burdine (1981), 450 U.S. 248, 253, citing McDonnell Douglas at 804. To establish pretext and that she was the victim of intentional discrimination, a plaintiff may make a direct showing that a discriminatory reason motivated the employer's action or an indirect showing "that the employer's proffered explanation is unworthy of credence." Id. at 256.
 {¶ 32} An employee may challenge the credibility of the employer's purported justification by demonstrating: "`(1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the discharge, or (3) that the proffered reason was insufficient to motivate the discharge.'"Owens v. Boulevard Motel Corp. (Nov. 5, 1998), Franklin App. No. 97APE12-1728, quoting Frantz v. Beechmont Pet Hosp. (1996),117 Ohio App.3d 351, 359. The United States Supreme Court has held that:
"The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons willpermit the trier of fact to infer the ultimate fact of intentional discrimination." * * *
(Emphasis sic.) Reeves v. Sanderson Plumbing Products, Inc.
(2000), 530 U.S. 133, 147, quoting St. Mary's Honor Center v.Hicks (1993), 509 U.S. 502, 511.
 {¶ 33} While appellees correctly assert that a factfinder's disbelief of the employer's articulated reason for termination does not compel judgment for the plaintiff, the Supreme Court held that, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."Reeves at 147. In Reeves, the Supreme Court concluded that it is not always necessary for a plaintiff to introduce independent evidence of discrimination to show pretext where there is sufficient evidence to reject the employer's explanation. Id. at 147-148; Peters v. Lincoln Elec. Co. (C.A.6, 2002),285 F.3d 456, 470. Because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Supreme Court rejected the premise that a plaintiff must always introduce additional, independent evidence of discrimination. Reeves at 149.
 {¶ 34} An employer's business decision is not an absolute defense to unlawful discrimination. Wexler v. White's FineFurniture, Inc. (C.A.6, 2003), 317 F.3d 564, 576, citingE.E.O.C. v. Yenkin-Majestic Paint Corp. (C.A.6, 1997),112 F.3d 831, 835. In Wexler, the Sixth Circuit held that a court may consider the reasonableness of an employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation. Wexler at 576, citing Smith v. Chrysler Corp.
(C.A.6, 1998), 155 F.3d 799, 807. Other federal circuits have likewise concluded that the reasonableness of an employer's decision is critical in determining whether the proffered reason was the employer's actual motivation. See Montana v. First Fed.S. L. Assn. of Rochester (C.A.2, 1989), 869 F.2d 100, 106 (where "the plaintiff claims not that her employer used poor business judgment in discharging her but that her employer used the structural reorganization as a cover for discriminatory action, a federal court * * * is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith"); Ryther v. KARE 11 (C.A.8, 1997), 108 F.3d 832, certiorari denied, 521 U.S. 1119; Loeb v. Textron, Inc. (C.A.1, 1979), 600 F.2d 1003, 1012, fn. 6.
 {¶ 35} Although Hall does not dispute that Bank One was in the midst of an economic downturn, which resulted in reduced earnings and falling stock prices, she argues that the record contains sufficient evidence from which a reasonable juror could reject appellees' assertion that her discharge was an economic necessity. Hall points to evidence that she was the only government relations employee terminated and that appellees immediately replaced her with Stewart. Appellees had no written plan to restructure or refocus government relations or to reduce government relations costs through a reduction in force. Prior to terminating Hall, neither Buldak nor any employee at Buldak's request drafted documents proposing a new focus or structure for government relations. Appellees did not consider the proposed budget cuts for government relations that Hall had compiled at Istock's request and did not consider terminating other government relations personnel. After her termination, the government relations budget increased, rather than decreased. Additionally, Hall asserts that appellees' claimed economic necessity rationale is questionable in light of the recent hiring of Stewart after the start of Bank One's financial difficulties.
 {¶ 36} The undisputed evidence demonstrates that Hall was qualified to lead the Government Relations Group, both before and after its purported refocus to increase the bank's reliance on industry associations for lobbying and to decrease its emphasis on BOPAC. Appellees acknowledge that they did not terminate Hall for performance deficiencies and that a substantial portion of Hall's responsibilities remained within the Government Relations Group after her termination. Prior to her termination, Hall performed all of the functions Stewart assumed in her new position. Nevertheless, despite her experience in government relations and with Bank One particularly, appellees did not offer Hall the position of leading the refocused Government Relations Group. Rather, appellees charged Stewart, who had only been with the bank six months, possessed less experience than Hall, and was not a member of the protected class, with leading the Government Relations Group. Moreover, despite appellees' stated goal of reducing expenses, there was no showing of an attempt to scale back Bank One's use of BOPAC, and the government relations budget increased, rather than decreased, after Hall's termination.
 {¶ 37} Upon review of the record, we find sufficient evidence from which the trier of fact could reject appellees' proffered non-discriminatory reason for terminating Hall. Reeves
recognized that rejection of the employer's non-discriminatory reason will not always prohibit a finding that the employer is entitled to judgment as a matter of law where "no rational factfinder could conclude that [appellees'] action was discriminatory." Reeves at 148. For example, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision."
 {¶ 38} Concurring in Reeves, Justice Ginsburg recognized the uncommon nature of cases where, despite evidence demonstrating a plaintiff's prima facie case and evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false, judgment as a matter of law in the employer's favor is proper:
* * * I anticipate that such circumstances will be uncommon. * * * [E]vidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation. * * * [T]he inference remains — unless it is conclusively demonstrated * * * that discrimination could not have been the defendant's true motivation. If such conclusive demonstrations are (as I suspect) atypical, it follows that the ultimate question of liability ordinarily should not be taken from the jury once the plaintiff has introduced the two categories of evidence described above. * * *
Reeves at 154-155 (Ginsburg, J., concurring). In this case, the record does not "conclusively [reveal] some other, nondiscriminatory reason for the employer's decision[.]" See id. at 148.
 {¶ 39} In their motion for summary judgment, appellees cite to some evidence that Hall refused to accept Buldak as her superior, and that both Buldak and Istock maintained concerns regarding Hall's communication style. As a result of his opinion that Hall "had difficulty in communicating in a way that I thought was appropriate within our organization[,]" Istock counseled Hall. (Istock Depo. at 86.) Additionally, Barbara Bernstein, a Bank One human resources business partner, informed Buldak of complaints about Hall's treatment of two government relations employees in early 1999.
 {¶ 40} Despite such evidence, appellees did not assert the personal and professional conflicts between Istock, Buldak, and Hall as a legitimate, non-discriminatory reason for Hall's termination. Instead, appellees put forth only the reduction in force as their legitimate, non-discriminatory reason for terminating Hall. Because appellees did not develop any argument on summary judgment with respect to a legitimate, non-discriminatory reason other than the reduction in force, Hall had the opportunity to present evidence of pretext only as to the reduction in force. Given appellees' failure to argue any other legitimate, non-discriminatory reason for their action, coupled with Hall's lack of opportunity to argue that such reason was pretextual, we find that the record on summary judgment does not conclusively reveal some other, non-discriminatory reason for appellees' actions.
 {¶ 41} Because the factfinder's disbelief that the reduction in force due to economic necessity motivated Hall's termination, coupled with the evidence constituting Hall's prima facie case, would permit the fact finder to infer the ultimate fact of intentional discrimination, we find that appellees are not entitled to judgment as a matter of law on Hall's age discrimination claim. Therefore, we find that the trial court erred in granting summary judgment on Hall's age discrimination claim, and we sustain Hall's first assignment of error.
 {¶ 42} In her second assignment of error, Hall argues that the trial court erred by granting appellees summary judgment on her retaliation claim, in which she alleged that appellees unlawfully retaliated against her for retaining legal counsel and complaining about discriminatory treatment. An employer may not retaliate against an employee who has opposed an unlawful discriminatory practice or who has made a charge under R.C.4112.01 through 4112.07. Peterson v. Buckeye Steel Casings
(1999), 133 Ohio App.3d 715, 727. To prove a claim of retaliation, a plaintiff must establish that: (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) that a causal link exists between the protected activity and the adverse action. Id. In order to demonstrate the causal link between protected activity and adverse action, the plaintiff must demonstrate that the employer would not have taken the adverse action but for the protected activity. Johnson v. City of Fort Wayne, Ind. (C.A.7, 1996),91 F.3d 922, 939; Boggs at ¶ 23 (plaintiff cannot prevail on a retaliatory discharge claim if the evidence demonstrates that the employer would have terminated her regardless of whether she participated in the protected activity).
 {¶ 43} In the absence of direct evidence of an employer's intent, courts apply the same burden-shifting analysis to a retaliatory discharge claim that they apply to an age discrimination claim. To establish a prima facie case of retaliation, Hall must demonstrate that: (1) she engaged in protected activity; (2) appellees knew of her participation in the protected activity; (3) appellees engaged in retaliatory conduct; and (4) the alleged retaliatory conduct followed her protected activity sufficiently close in time to warrant the inference of retaliatory motivation. Doan v. S. Ohio Adm. Dist.Council, Internatl. Union of Bricklayers Allied Craftworkers
(2001), 145 Ohio App.3d 482, 488. The burden of establishing a prima facie case of retaliation is not onerous and is easily met.Nguyen v. City of Cleveland (C.A.6, 2000), 229 F.3d 559, 563. If Hall is able to establish a prima facie case of retaliation, the burden of production shifts to appellees to articulate a legitimate, non-discriminatory reason for the adverse employment action. See Peterson at 727. If appellees meet their burden of production, the burden shifts back to Hall to demonstrate that appellees' proffered reasons were a pretext for retaliation. Id. At all times, the plaintiff retains the ultimate burden of persuasion. Burdine at 256.
 {¶ 44} The trial court found that, assuming she established a prima facie case, Hall did not come forward with evidence demonstrating that appellees' proffered reasons for her termination were pretext for retaliation. The trial court also concluded that summary judgment was appropriate because Hall failed to show that appellees would not have terminated her absent her participation in protected activity.
 {¶ 45} It is undisputed that Hall engaged in protected activity when she sought legal counsel and complained of allegedly discriminatory treatment, that appellees learned of Hall's participation in protected activity when they received her attorney's letter in early January 2000, and that appellees terminated Hall's employment. On summary judgment, Hall argued that the timing of her termination, two months after appellees learned that she had hired counsel regarding allegations of discriminatory conduct, was sufficient to establish a prima facie case of retaliation. Like the trial court, we will presume that Hall established her prima facie case and proceed through the burden-shifting analysis described above.
 {¶ 46} As in their response to Hall's age discrimination claim, appellees asserted that they eliminated Hall's position as part of a reduction in force. Appellees also point to other factors that prompted changes to the bank's performance of government relations functions, including acting CEO Istock's approach to government relations, which involved reducing the bank's lobbying presence in Washington and the bank's emphasis on maintaining an aggressive and active political action committee. Buldak stated that the letter from Hall's counsel had no impact on appellees' actions regarding Hall.
 {¶ 47} By itself, temporal proximity between protected activity and an adverse employment action is insufficient to support an inference of retaliatory discrimination if there is no other compelling evidence. Aycox v. Columbus Bd. of Edn.,
Franklin App. No. 03AP-1285, 2005-Ohio-69, at ¶ 20, citingNguyen at 566. In Aycox, this court followed federal cases in which courts deemed intervals of two to four months between protected activity and adverse action insufficient to show a causal connection. Id. at ¶ 21. Specifically, we cited Kipp v.Missouri Highway Transp. Comm. (C.A.8, 2002), 280 F.3d 893, 897, in which the Eighth Circuit held that an interval of two months between complaint and adverse action "so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link."
 {¶ 48} Hall argues that the temporal proximity between appellees learning of her protected activity and terminating her employment, coupled with evidence demonstrating a marked shift in appellees' attitudes toward her, establishes a genuine issue of material fact as to whether appellees' proffered reasons are pretext for retaliation. Despite her contrary assertion, we find no evidence of a negative shift in appellees' attitudes toward Hall after they learned of her participation in protected activity. Rather, Hall took issue with appellees' attitude toward her and voiced concerns about her employment security with Bank One prior to appellees learning that she had retained legal counsel.
 {¶ 49} On December 31, 1999, approximately one week before Hall's attorney wrote to Bank One, Hall e-mailed Buldak, asking if he and Istock wanted her to "bow out in some way[.]" Hall stated that she had "many job offers but, after 17 years, [could not] get the Bank One blue blood out of [her] system." Hall expressly complained about Istock's attitude toward her, including his refusal to return her phone or e-mail messages and his direction of responses to her questions through Buldak.
 {¶ 50} Buldak replied to Hall's e-mail the same day and suggested that he and Hall meet to discuss the issues she raised. Buldak described the government relations situation as "fluid" and emphasized that some CEOs do not devote as much time to government relations as McCoy. Buldak warned Hall that BOPAC would likely not have as much visibility as before, and emphasized that the new CEO and the head of government relations would have to "be on the same wave length." On January 3, 2000, Buldak again e-mailed Hall, stating that "[n]o matter who or what happens at the CEO level, things will not be the same for you because of the special attention [McCoy] gave [government relations] and the PAC." Buldak emphasized that "changes * * * presumably will occur." The following day, Buldak e-mailed Hall yet again, advising her of his agenda for their upcoming meeting with Istock. Buldak's agenda included reducing Bank One's presence in Washington, reducing the emphasis on BOPAC, and the possibility of using projects like the annual report and trustee meeting to communicate a revised approach to government relations. Each of these communications occurred prior to appellees' receipt of the letter from Hall's counsel. Thus, prior to appellees learning of Hall's participation in protected activity via receipt of the January 7, 2000 letter, Hall was well aware of likely changes to the focus and structure of the Government Relations Group and the insecurity of her position therein.
 {¶ 51} In the January 13, 2000 meeting, Istock expressed a need to cut costs, as well as his interest in a less aggressive political action committee and a reduction in Bank One's presence in Washington. Istock's stated goals are consistent with Buldak's agenda, as expressed in his January 4, 2000 e-mail. Despite Buldak's warning that the CEO and the head of government relations had to be "on the same wave length[,]" Hall expressed her displeasure with the direction in which Istock was steering government relations in the January 13, 2000 meeting. Subsequent to the January 13, 2000 meeting, Hall continued to express her resistance to changes in government relations and her feelings that Bank One was heading government relations in the wrong direction.
 {¶ 52} A plaintiff cannot prevail on a claim of retaliatory discharge if it appears from the evidence that the employer would have made the same decision regardless of plaintiff's participation in the protected activity. Neal v. Hamilton Cty.
(1993), 87 Ohio App.3d 670, 678. Given McCoy's recent departure from Bank One and Hall's knowledge of Istock's substantially different approach to government relations, Hall was aware of potential changes to the Government Relations Group, as evidenced in her e-mail communications with Buldak. Although Hall claims that neither Buldak nor Istock ever mentioned restructuring the Government Relations Group or the need to terminate employees, her correspondence with Buldak contradicts her professed lack of knowledge that substantial changes were imminent. Hall was admittedly aware of the need to cut costs in the Government Relations Group, was aware of Istock and Buldak's vision for the direction of the group, and expressed her disagreement with that vision. Upon careful review of the record, as it existed at the time the trial court ruled on appellees' motion for summary judgment, and viewing the evidence in the light most favorable to Hall, we conclude that Hall failed to demonstrate that appellees would not have terminated her but for her participation in protected activity. Therefore, the trial court properly granted summary judgment on her retaliation claim, and we overrule Hall's second assignment of error.
 {¶ 53} In her third assignment of error, Hall argues that the trial court erred by refusing to provide her an impartial jury for the trial of her sex discrimination claim. Specifically, Hall argues that the trial court committed reversible error by denying her challenge for cause to juror Michael Stein ("Juror Stein") and by overruling her Batson challenge to appellees' use of peremptory challenges to strike African-American jurors. We will address Hall's concerns regarding jury selection in turn.
 {¶ 54} The first portion of Hall's third assignment of error deals with the trial court's denial of her challenge of Juror Stein for cause during voir dire. As the Supreme Court recognized nearly a century ago in Lingafelter v. Moore (1917),95 Ohio St. 384, 387:
It is beyond question that the right of trial by jury guaranteed by the Constitution carries with it by necessary implication the right to a trial by a jury composed of unbiased and unprejudiced jurors. This right being guaranteed, all courts are charged with the imperative duty of affording every litigant the opportunity of having his cause tried by an impartial jury. * * *
 {¶ 55} R.C. 2313.42 and 2313.43 control challenges for cause in Ohio. R.C. 2313.42 sets forth basic qualifications to serve as a juror and grounds for challenging a person otherwise qualified to serve. It provides, in pertinent part, as follows:
The following are good causes for challenge to any person called as a juror:
* * *
(E) That he is the employer, the employee, or the spouse, parent, son, or daughter of the employer or employee, counselor, agent, steward, or attorney of either party;
* * *
(J) That he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court.
Each challenge listed in this section shall be considered as a principal challenge, and its validity tried by the court.
R.C. 2313.43 states:
In addition to the causes listed under section 2313.42 of the Revised Code, any petit juror may be challenged on suspicion of prejudice against or partiality for either party * * *. The validity of such challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased.
 {¶ 56} Hall challenged Juror Stein for cause, pursuant to R.C. 2313.42(E), because two of Juror Stein's children are Bank One employees and a third of Juror Stein's children is a former Bank One employee. Juror Stein's son, Jason, works in Bank One's "computer department," and his son, John, is the branch manager of Bank One's Sunbury, Ohio branch. Juror Stein's daughter formerly worked for Bank One, but her position was eliminated. Thus, Juror Stein undisputedly fits within the statutory language of R.C. 2313.42(E) as "the * * * parent * * * of the * * * employee * * * of either party[.]"
 {¶ 57} In response to Hall's challenge of Juror Stein, appellees argued that Juror Stein assured counsel and the court that nothing would affect his unbiased evaluation of the evidence or credibility of the witnesses. When questioned about his feelings toward Bank One as a result of the elimination of his daughter's position, Juror Stein testified that he had no negative feelings toward Bank One as a result of his daughter's experience and that his daughter felt that she was more than fairly treated. Juror Stein testified that he: had no particular loyalty toward Bank One as a result of his children's employment; did not personally know anyone else who worked for Bank One; would have no problem impartially evaluating the evidence and applying the law; and would not feel uncomfortable sitting on the jury.
 {¶ 58} After listening to Juror Stein's responses during voir dire, the trial court found credible Juror Stein's repeated statements that he could impartially judge the case and denied Hall's challenge. Given Juror Stein's assurances of impartiality, appellees argue that the trial court acted within its discretion in denying Hall's challenge for cause. To the contrary, Hall argues that R.C. 2313.42(E) mandates disqualification despite Juror Stein's assurances of impartiality.
 {¶ 59} The real issue before this court is whether a trial judge, faced with a juror who undeniably fits within R.C.2313.42(E), retains discretion to deny a challenge for cause. Assuming the trial court possesses such discretion, we would find no abuse here. Juror Stein repeatedly assured the court that he could impartially evaluate the evidence and the credibility of the witnesses and that he had no particular loyalty or bias in favor of Bank One. The trial court, having the opportunity to observe Juror Stein's demeanor and testimony, found such assurances credible. Furthermore, Bank One employs thousands of people, and there is no indication that any of Juror Stein's children was in any way, directly or indirectly, involved in the events underlying this case. Thus, the connection between Juror Stein and Bank One is, at best, remote. See Richter v. Univ.Hosp. of Cleveland (May 5, 1983), Cuyahoga App. No. 45382 (no abuse of discretion for trial court to allow service by juror whose child was employed by a party where the child is one of many employees, the child was not involved with the lawsuit, and the juror affirmatively states that the parent-child relationship will not influence her decision).
 {¶ 60} The Supreme Court of Ohio addressed juror challenges for cause in Berk v. Matthews (1990), 53 Ohio St.3d 161. InBerk, a jogger who had been struck by an automobile brought an action against the driver of the automobile for personal injuries. During voir dire, a prospective juror admitted that she had almost hit joggers with her own automobile and stated her opinion that joggers do not belong in the street. Nevertheless, the prospective juror repeatedly stated that she could keep her personal opinion outside the jury room and base her decision on the facts and the law as instructed by the court. After the trial court overruled a challenge for cause, pursuant to R.C.2313.42(J), based on the juror's assurances that she could remain unbiased and impartial, the appellate court reversed.
 {¶ 61} The Supreme Court concluded that the appellate court applied the wrong standard of review and inappropriately substituted its judgment for that of the trial court when it disregarded the potential juror's assurances of impartiality. The Supreme Court held:
The determination of whether a prospective juror should be disqualified for cause pursuant to R.C. 2313.42(J) is a discretionary function of the trial court. Such determination will not be reversed on appeal absent an abuse of discretion. (Maddex v. Columber [1926], 114 Ohio St. 178, 151 N.E. 56, approved and followed.)
Berk at syllabus. In the body of the Berk opinion, the Supreme Court states, more generally: "We therefore hold that the determination of whether a prospective juror should be disqualified for cause is a discretionary function of the trial court." Id. at 169. Thus, although the underlying challenge inBerk was premised on R.C. 2313.42(J), the Berk opinion does not expressly limit its holding to R.C. 2313.42(J).
 {¶ 62} Although Berk clearly holds that the determination of whether to disqualify a prospective juror, pursuant to R.C.2313.42(J), is within the trial court's discretion, it is less clear whether such discretion extends to the determination of whether to disqualify a prospective juror pursuant to other subsections of R.C. 2313.42. There is currently a dispute among Ohio's appellate districts on this question. The Sixth Appellate District has held that, although juror challenges made pursuant to R.C. 2313.42(J) and 2313.43 are subject to an abuse of discretion standard, the causes "for juror challenge enumerated in R.C. 2313.42(A)-(I), if proven, per se disqualify a prospective juror from service." Parusel v. Ewry, Lucas App. No. L-02-1402, 2004-Ohio-404, at ¶ 36, appeal not allowed (2004),102 Ohio St.3d 1472. To the contrary, the Fourth, Eighth, and Ninth Appellate Districts have suggested that a trial court retains discretion to determine whether to disqualify a prospective juror employed by a party or whose child is employed by a party, pursuant to R.C. 2313.42(E). See Bell v. Babcock Wilcox Co. (Sept. 1, 1993), Summit App. No. 15887; Richter
("as it encompasses a broad range of possible relationships which may or may not render a prospective juror subject to subtle prejudice and bias, [R.C. 2313.42(E)] is amenable to inquiry by the court as to the possibility of bias or prejudice"); Metzgerv. Al-Ataie, Gallia App. No. 02CA11, 2003-Ohio-2784 (finding no abuse of discretion where the trial court permitted service by a juror who had a daughter employed in an unspecified capacity by a defendant).
 {¶ 63} In the Berk syllabus, the Supreme Court approved and followed Maddex v. Columber (1926), 114 Ohio St. 178, in which the plaintiff challenged a prospective juror based on the prospective juror's interest as a taxpayer in the city of Kenton, a party-defendant. The relevant statute governing challenges for cause in Maddex was G.C. 11437, a predecessor to R.C. 2313.42. With minor modifications, R.C. 2313.42 and 2313.43 are nearly identical to former G.C. 11437 and 11438. See State v. Ellis
(1918), 98 Ohio St. 21, 26-27. Like R.C. 2313.42, G.C. 11437 enumerated a number of "good causes for challenge" or "principal challenges." For the most part, the principal challenges listed in G.C. 11437 parallel those listed in R.C. 2313.42.
 {¶ 64} Under G.C. 11437(2), a good cause for challenge existed where a person called as a juror had an interest in the case. Likewise, under R.C. 2313.42(B), a potential juror's interest in the case is a good cause for challenge. Thus, under both the current statute and the statute at issue in Maddex, a prospective juror's interest in the case constitutes a principal challenge. In Maddex, the plaintiff argued that, as a taxpayer to the municipal defendant, a prospective juror had an interest in the case and challenged the juror for cause, pursuant to G.C. 11437(2). The Supreme Court noted that "[m]uch is necessarily confided to the trial judge * * * in the interpretation of a statute showing the qualification of a juror, in determining whether or not he has an interest in the case, such as would disqualify him." Id. at 183. As to what constitutes an interest of a prospective juror, such as would disqualify him from serving, the Supreme Court noted:
The consensus of opinion seems to be that, if a juror on inquiry should say that he has an interest by reason of which hewould not be able to render a fair and impartial verdict, he is thereby disqualified; but, if his interest by reason of being a taxpayer is not such as would affect his verdict, and if, regardless of the fact of being a taxpayer, he could listen to the evidence and render a fair and impartial verdict, under the instructions of the court as to the law, then such proposed juror is not disqualified.
(Emphasis added.) Id. at 184.
 {¶ 65} Without rejecting the plaintiff's argument that the prospective juror's taxpayer status constituted an interest in the cause, the Maddex court held that such an interest did not per se disqualify the juror from service. The court concluded:
* * * [I]f a proposed juror otherwise qualified expresses himself as being able to render a fair and impartial verdict on the evidence and under the instructions of the court as to the law, regardless of the fact that he is a taxpayer in a municipality which may be a party to an action, and the trial court is satisfied that the proposed juror is entirely unbiased and has no prejudice against or partiality for either party by reason of being a taxpayer, and overrules an objection to said juror upon such ground, and permits him to serve as a juror in the case, such action of the trial judge should not be reversed for error in so doing.
Id. at 185. Thus, in Maddex, the Supreme Court recognized that a principal challenge for cause does not deprive a trial court of discretion to determine whether to disqualify a prospective juror, where the prospective juror expresses himself as able to render a fair and impartial verdict on the evidence and under the law. Berk's approval and following of Maddex
leads us to conclude that the trial court retains discretion to permit a prospective juror who fits within R.C. 2313.42(E) to serve if the prospective juror convinces the court that he is entirely unbiased and can render an impartial verdict.
 {¶ 66} Hall encourages us to follow Parusel, in which the Sixth Appellate District concluded that the Supreme Court's holding in Berk is limited to challenges for cause under R.C.2313.42(J). There, the Sixth District determined that courts should treat challenges for cause under R.C. 2313.42
inconsistently, depending on the subsection upon which they are premised. The court held that "[t]he `good causes' for juror challenge enumerated in R.C. 2313.42(A)-(I), if proven, per se disqualify a prospective juror from service" and that "R.C.2313.42(J) and 2313.43, to which it is related, are reviewed on an abuse of discretion standard." Parusel at ¶ 36-37. As stated in Parusel and by the dissent here, we acknowledge that courts have historically treated a "principal challenge" as a challenge, which, if true, may not be overruled. Nevertheless, our reading of Maddex and Berk, coupled with persuasive authority from the Fourth, Eighth, and Ninth Appellate Districts, persuade us that the trial court retains discretion to deny a challenge for cause under R.C. 2313.42(E) when convinced that the prospective juror can serve without bias.
 {¶ 67} In an attempt to explain the Berk court's reliance on Maddex, the Parusel court stated that "Maddex is not wholly clear, but appears to be referring to [G.C. 11438 (now R.C. 2313.43)] to which the abuse of discretion standard is applied." Id. at ¶ 35. In Maddex, the Supreme Court expressly articulated the question before it as whether or not the retention of a proposed juror who was a taxpayer over the plaintiff's challenge violated subsection 2 of G.C. 11437.Maddex at 182-183. Thus, contrary to the Sixth District's assertion in Parusel, we find that, in Maddex, the Supreme Court was considering a principal challenge, pursuant to G.C. 11437(2) (now R.C. 2313.42[B]), rather than a challenge pursuant to G.C. 11438, for which it was already well-settled that an abuse of discretion standard applied. See Dew v. McDivitt
(1876), 31 Ohio St. 139, paragraph one of the syllabus ("[o]n the trial of the validity of a challenge alleged against a juror, other than a principal cause of challenge, a sound discretion is allowed to the court"); Lingafelter at 389. Thus, we disagree with Parusel's holding that the challenges for cause enumerated in R.C. 2313.42(A) through (I), if proven, per se disqualify a prospective juror.
 {¶ 68} Upon review, we find that the trial court possessed discretion to determine whether Juror Stein's status as the parent of Bank One employees would affect his ability to render an impartial and unbiased verdict based on the evidence and the applicable law, as instructed by the court. As stated above, we find no abuse of discretion in the trial court's denial of Hall's challenge for cause.
 {¶ 69} The second portion of Hall's third assignment of error deals with the trial court's denial of her Batson challenge to appellees' use of peremptory strikes against four African-American jurors. In Batson v. Kentucky (1986),476 U.S. 79, 89, the United States Supreme Court held that the Equal Protection Clause of the United States Constitution prohibits purposeful discrimination in the exercise of peremptory challenges as to exclude members of minority groups from service on petit juries. Although Batson was a criminal case, a private litigant in a civil case is likewise precluded from discriminatorily using peremptory challenges to exclude jurors on account of race. Edmonson v. Leesville Concrete Co., Inc.
(1991), 500 U.S. 614, 616.
 {¶ 70} Determination of whether a peremptory challenge is race-based involves a three-step burden-shifting procedure. First, the proponent of the challenge must make a prima facie showing that the opposing party purposefully discriminated in exercising a peremptory challenge. A prima facie case of purposeful discrimination requires a demonstration that: (1) members of a cognizable racial group were peremptorily challenged; and (2) the facts and other relevant circumstances raise an inference that the opposing party used the peremptory challenges to exclude jurors on account of their race. State v.Hill (1995), 73 Ohio St.3d 433, 444-445. If the proponent of the challenge makes a prima facie showing, the burden shifts to the opposing party to provide a race-neutral explanation for the peremptory challenge. Id. at 445. The reason given need not rise to the level justifying exercise of a challenge for cause.Batson at 97. "`Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Purkett v. Elem (1995), 514 U.S. 765, 768, quoting Hernandez v. New York (1991), 500 U.S. 352, 360
(plurality opinion) ("Hernandez I"). Finally, the trial court must determine if the proponent of the challenge has established purposeful discrimination. Batson at 98. "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." State v. Gowdy
(2000), 88 Ohio St.3d 387, 393, citing Purkett at 768.
 {¶ 71} "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." Hernandez I at 365. An appellate court must give the trial court's findings great deference because such findings rest largely upon the court's evaluation of the attorney's credibility. Id.; State v. Bannerman (Mar. 4, 1997), Franklin App. No. 96APA06-791. We may reverse only upon finding that the trial court's decision was clearly erroneous. State v.Hernandez (1992), 63 Ohio St.3d 577, 583, certiorari denied,506 U.S. 898. "To overturn the trial court's finding that there was no discriminatory intent, this court must be left with the definite and firm conviction that a mistake was committed."State v. Belcher (1993), 89 Ohio App.3d 24, 30.
 {¶ 72} Hall initially raised a Batson challenge during the first day of voir dire, after appellees used their third peremptory challenge to strike a third African-American juror, and the trial court recessed for the day with Hall's Batson
challenge pending. The following morning, the prospective juror, with respect to whom the Batson challenge related, did not appear for court. Hall withdrew her Batson challenge, permitting appellees' third peremptory challenge to stand. Later, on the second day of voir dire, when appellees exercised a peremptory challenge on an African-American alternate juror, Hall again raised a Batson challenge.
 {¶ 73} The trial court applied the appropriate analysis and found that Hall established a prima facie showing of discrimination based on appellees' use of four peremptory challenges on African-American jurors. In response, appellees proffered race-neutral reasons for their exercise of each peremptory strike. Appellees used their first peremptory strike because the prospective juror's husband had filed a discrimination suit against his employer. Appellees used their second peremptory strike because the prospective juror intended to file a wrongful termination claim against his former employer, who had recently fired him. Appellees used their third peremptory strike because the prospective juror had less than a high school education and minimal job experience, causing appellees to question her ability to analyze the evidence. Appellees used their final peremptory strike because the prospective alternate juror, a former Bank One employee, stated that she could not be fair and impartial in evaluating the evidence in this case after her own unsuccessful complaint to a Bank One supervisor upset her to the point that she quit her job with Bank One. Appellees also feared that the prospective alternate juror's familiarity with government pay grades would improperly influence her ability to fairly judge evidence involving pay grades at Bank One. Because no discriminatory intent is inherent in the reasons appellees articulated for their use of peremptory strikes, the trial court correctly concluded that appellees met their burden of espousing race-neutral reasons for their peremptory strikes.
 {¶ 74} Under the third step of the Batson analysis, the trial court was required to determine whether appellees' articulated reasons were a mere pretext for unconstitutional, racially motivated strikes. After viewing the voir dire proceedings and listening to the arguments of counsel, the trial court made clear that it understood and applied the appropriate test in evaluating Hall's Batson challenge and concluded that it had no reason to disbelieve the race-neutral explanations given by appellees' counsel. The transcript of voir dire provides support for each of the race-neutral reasons that appellees offered to justify their use of peremptory strikes. Because the trial court's findings largely turn upon its evaluation of credibility, reviewing courts should give the trial court's determinations great deference. Hernandez I at 365. The trial court was in the best position to assess the validity of the explanation appellees' counsel offered for the use of their peremptory strikes. Based on our careful review of the voir dire transcript, and giving due deference to the trial court's findings, we cannot say that the trial court clearly erred in overruling Hall's Batson challenge. Thus, we overrule Hall's third assignment of error.
 {¶ 75} In her final assignment of error, Hall asserts that the trial court erred in failing to compel discovery by appellees. Hall claims that she brought appellees' failure to produce discovery to the court's attention during trial and, subsequently, in a motion for a new trial. She argues that the court erred in failing to compel production, sanction appellees for discovery abuses, and grant a new trial.
 {¶ 76} A trial court possesses discretion to control discovery proceedings, and we will not reverse an exercise of that discretion absent an abuse. Mauzy at 592. Likewise, the decision to grant or deny a motion for new trial is a matter within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. Sharp v.Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307, 312. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 77} The record here demonstrates that the trial court repeatedly met with counsel throughout the proceedings below to discuss pending discovery issues and repeatedly granted Hall's motions to compel discovery. Nevertheless, in her motion for a new trial, pursuant to Civ.R. 59, Hall argued that she was entitled to a new trial, in part, because appellees failed to produce documents ordered by the court. In both her motion for a new trial and her appellate brief, Hall refers to testimony at trial as the basis for her complaints of discovery abuse. Hall asserts that testimony at trial and exhibits admitted at trial revealed that appellees failed to produce e-mails sent to and from Hall, signed separation agreements, compensation data, and complete access to Hall's laptop computer. Such alleged failures, evidenced by trial testimony, form the basis for Hall's requested relief.
 {¶ 78} Neither party has supplied this court with a transcript of the trial proceedings below. Because an appellant bears the burden of showing error by reference to matters in the record, the duty to provide a transcript for appellate review falls upon the appellant. Knapp v. Edwards Laboratories (1980),61 Ohio St.2d 197, 199. "When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." Id.
 {¶ 79} Appellees argue that Hall's failure to file a trial transcript requires this court to presume the validity of the trial court's administration of the discovery process and overrule Hall's fourth assignment of error. On the other hand, Hall argues that a transcript is unnecessary to support her fourth assignment of error because she repeatedly sought the trial court's assistance in discovery throughout the pretrial process. Despite her assertions that appellees' failure to comply with discovery extended throughout the litigation below, Hall's allegations of discovery abuse in her motion for a new trial and on appeal are based on testimony elicited at trial. It is with such testimony that Hall supports her claims that appellees had possession of, but failed to produce, specific categories of documents. Hall claims that, during the course of trial, her counsel brought to the trial court's attention a continuing series of discovery issues. Determination of whether the trial court abused its discretion in responding to discovery issues Hall raised at trial or by failing to compel discovery and grant a new trial, necessarily requires review of the trial testimony upon which Hall bases her allegations of discovery abuse and the trial court's responses thereto. Absent a transcript, we must presume the regularity of the proceedings at trial, including the trial court's rulings on any discovery issues raised therein. Upon review of the record before us, we find no abuse of discretion in the trial court's administration of discovery, including the court's denial of Hall's motion for a new trial based on discovery abuses discovered at trial. Therefore, we overrule Hall's fourth assignment of error.
 {¶ 80} As set forth above, we sustain Hall's first assignment of error and overrule Hall's second, third, and fourth assignments of error. Therefore, we affirm the judgment of the Franklin County Court of Common Pleas on Hall's claims of sex discrimination and retaliation, and we reverse on Hall's age discrimination claim. Accordingly, this cause is remanded to the trial court for further proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part, and causeremanded.
Sadler, J., concurs.
Whiteside, J., concurs in part and dissents in part.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), ArticleIV, Ohio Constitution.